JAPAN AIRLINES COMPANY, LTD., Plaintiff–Appellee–Cross–Appellant,

v.

PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Defendant–Appellant–Cross–Appellee.

Nos. 98–7634, 98–7694.

United States Court of Appeals, Second Circuit.

Argued March 8, 1999.

Decided May 25, 1999.

Anne M. Tannenbaum, New York, New York (Milton H. Pachter, Arthur P. Berg, Megan Lee, Kathleen M. Collins, New York, New York, of counsel, also David Schierholz, summer law intern who assisted on the brief), for Defendant–Appellant.

George N. Tompkins, Jr., New York, New York (Andrew J. Harakas, Deborah A. Stamos, Susan S. Kang, Roseman & Colin LLP, New York, New York, of counsel), for Plaintiff–Appellee.

Before: CARDAMONE, STRAUB, and KEITH,* Circuit Judges.

KEITH, Circuit Judge:

This is a negligence action arising out of an incident involving a Japan Airlines

---

* Honorable Damon J. Keith, of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

("JAL") Boeing 747–400 passenger aircraft which was damaged when one of its wing-mounted engines ingested ice after landing at John F. Kennedy International Airport ("JFK") on December 13, 1993. Defendant-appellant/Cross-appellee, the Port Authority of New York and New Jersey ("Port Authority"), is the operator of JFK. At trial JAL, the Plaintiff-appellee/Cross-appellant, sought to recover under New York law for damage sustained by its aircraft due to the alleged failure of the Port Authority to properly clear snow and ice from Runway 31R and the adjacent areas. The parties stipulated that the amount of damages totaled $1,337,600.00 and a 7 day jury trial was held on the issue of liability.

At the close of JAL's evidence, the Port Authority moved for a directed verdict, claiming that JAL had presented no evidence of negligence by the Port Authority. The district court denied the motion, finding that there was "ample evidence of negligence of the Port Authority here." The district court also rejected the Port Authority's argument that it was entitled to governmental immunity. At the close of the evidence, both parties moved for judgment as a matter of law. The district court reserved judgment as to both motions and submitted the case to the jury. After deliberating for two days, the jury found that: (1) the Port Authority had been negligent in carrying out its snow and ice removal operations, and that such negligence was a proximate cause of the damage to the aircraft; (2) JAL was negligent in landing its aircraft at JFK on December 13, 1993, and this negligence was a proximate cause of the damage to the aircraft; and (3) the Port Authority was not negligent in advising JAL of the landing conditions at JFK. The jury then apportioned liability for the stipulated damages in the amount of 50% to the Port Authority and 50% to JAL.

On appeal, the Port Authority contends that the district court erred in denying its motions for judgment as a matter of law, that the jury's verdict was against the great weight of the evidence, and that the district court erred in rejecting its claim of governmental immunity and instructing the jury to treat the Port Authority as it would any other corporation. On cross-appeal, JAL challenges the jury's verdict finding JAL 50% negligent and the district court's denial of costs to JAL as the prevailing party. For the reasons set forth below, we affirm in part and reverse in part.

## BACKGROUND

JAL Flight JL006, a B747–400 aircraft arriving at JFK nonstop from Japan, landed on Runway 31R on Monday, December 13, 1993 at approximately 10:00 a.m. Shortly after touching down, the Number 1 engine[1] of the aircraft ingested snow and chunks of ice, causing significant structural damage to the aircraft. The wingspan of the aircraft is 213 feet and the width of the runway is 150 feet (from edge light to edge light), with 20–40 feet of pavement beyond the edge lights. This runway configuration is narrow by industry standards and leaves very little margin for error for flight crews landing large aircraft, such as the one in the instant case. With the aircraft on the centerline of the runway, the center of the wing-mounted engine is 2 feet 9 inches from the runway edge; thus, a landing that is even slightly off center will cause one of the wings to overhang the edge of the runway.

During the several days preceding the incident, the airport experienced a winter storm that brought rain, ice and snow to the airport. JAL alleges that the Port Authority was negligent in clearing the runway and areas adjacent to the runway and that this negligence resulted in the presence of loose chunks of snow and ice behind the aircraft.

---

1. The B747–400 aircraft has four jet engines numbered 1–4 from left to right as seen from

on or near the runway. JAL further alleges that the Port Authority negligently failed to warn the flight crew of the presence of a dangerous condition near the runway prior to landing. The Port Authority responds that it did properly clear the runway, but admits to not removing the snow beyond the edge lights, claiming that it had no duty to do so. The Port Authority maintains that the aircraft either landed to the left of the runway's centerline or was allowed to drift left of the centerline on rollout, causing the Number 1 engine to overhang the edge of the runway.

After touching down on Runway 31R, the captain of Flight JL006, in accordance with standard operating procedure, applied maximum reverse thrust on all four engines to slow the aircraft. The reverse thrust is such that it directs a high amount of thrust forward and outward to the ground. As a result, any debris that is on the ground in front of or to the sides of the engine may be lifted into the air. Furthermore, because the engines are still taking in air to maintain combustion, any debris that is kicked up may be ingested into the engine. It is therefore undisputed that debris on or near the runways constitutes a safety hazard.

Captain Makoto Idesewa, Co-captain Hiroshi Itokawa, and First Officer Toshimichi Aoki, the flight crew of Flight JL006, all testified that the aircraft touched down on the centerline of the runway and stayed on the centerline at all times. JAL Chief Purser Kenji Adachi, who was seated facing one of the side windows of the aircraft, testified that he could not see where the aircraft touched down, but that he did observe a block of snow fly up towards the Number 1 engine shortly after landing. A Northwest Airlines pilot, Captain Ronald Windham, who was taxiing his aircraft on another runway at the time, testified that he observed compacted snow or ice blow up in front of the Number 1 engine of JL006. Captain Windham further testified that from his vantage point a half mile away, he could not see where the JAL aircraft was in relation to the centerline of the runway or the location of the Number 1 engine in relation to the edge of the runway. The Port Authority presented testimony from Trans World Airlines ("TWA") pilot Barry Schiff, who opined based on the eyewitness reports, that the Number 1 engine must have passed over a snowbank on the shoulder of the runway. An inspection of the aircraft after the incident revealed that the aircraft had suffered extensive damage to the Number 1 engine, left wing, and adjacent areas as a result of debris having been ingested into the engine.

The Port Authority of New York and New Jersey is a government-operated body which is responsible for developing public transportation within the statutorily determined Port District, which includes JFK, LaGuardia Airport, and Newark International Airport. The Port Authority is charged with operating the three airports for the benefit of the people of New York and New Jersey. Section 139.313 of the Federal Aviation Regulations ("F.A.R."), codified at Title 14 of the Code of Federal Regulations, requires each airport operator to "prepare, maintain, and carry out a snow and ice control plan," which must include instructions and procedures for:

(1) Prompt removal or control, as completely as practical, of snow, ice, and slush on each movement area;

(2) Positioning snow off of movement area surfaces so that all air crarrier [sic] aircraft propellers, engine pods, rotors, and wingtips will clear any snowdrift and snowbank as the aircraft's landing gear traverses any full strength portion of the movement areas;

(3) Selection and application of approved materials for snow and ice control to ensure that they adhere to snow and ice sufficiently to minimize engine ingestion;

(4) Timely commencement of snow and ice control operations; and

(5) Prompt notification, in accordance with § 139.339, of all air carriers using the airport when any portion of the movement area normally available to them is less than satisfactorily cleared for safe operation by their aircraft.

Section 139.313 further indicates that Advisory Circulars promulgated by the Federal Aviation Administration ("FAA") contain the acceptable standards for snow and ice control.

Pursuant to its obligations under the F.A.R., the Port Authority prepared, adopted, and published the JFK Snow Plan ("Snow Plan" or "Plan"). The Snow Plan is revised annually and was revised for the winter of 1993–94. The Snow Plan is prepared with input from the FAA, the airlines, and the Air Transport Association of America ("ATA"), and sets forth specific procedures, requirements, and rules as to when to activate the Snow Plan and the Port Authority's duties thereunder. The Plan requires the Port Authority to go on snow alert and have standby crews available at each of its airports when the weather forecast calls for precipitation and possible snow. The Plan also requires the Port Authority to collect and provide information to air carriers on any conditions which may affect the safe operation of aircraft, including (1) snow and ice on the runways and taxiways, and (2) snow piled or drifted on or near runways and taxiways. In accordance with its obligations under the Plan, the Port Authority closely monitors weather forecasts and conditions and periodically issues Notices to Airmen ("NOTAMs") informing the crews of inbound aircraft of conditions at JFK.

The Port Authority's operations log indicates that at 6:20 a.m. on Friday, December 10, 1993, it entered a weather forecast predicting a likelihood of rain and scattered snow showers as well as a temperature drop into the 30's for the following day. Some time before 11:30 a.m. on Saturday, December 11, it began to snow at JFK. At some time between 11:00 and 11:35 a.m., the Port Authority declared a snow emergency. At 12:30 p.m., the Port Authority opened the "Snow Desk," which is required to be operated at the start of a snowstorm. The Snow Desk serves as the central control point during all snowstorms and snow control and snow removal operations. As weather conditions changed throughout the day, a number of NOTAMs were issued to the airlines regarding the conditions of Runway 31R. NOTAM 27, issued at 4:55 p.m., indicated that Runway 31R was covered with ½ inch of wet snow. The runway was closed from 5:45 until 9:30 p.m. during which time it was broomed [2] and sanded. At 10:04 p.m. NOTAM 35 indicated that Runway 31R still had ¼ inch of compacted snow and ice, and that the runway had been broomed and sanded. The Port Authority's logs contain numerous entries regarding ice sheets and ice chunks on Runway 31R in the days leading up to the incident at bar.

On Sunday, December 12, 1993 the weather was clear and sunny with no precipitation. Runway 31R was closed from 7:00 a.m. to 1:05 p.m. for snow removal and then re-opened. On Monday, December 13, at 5:20 a.m., NOTAM 47 was issued for Runway 31R indicating that there were scattered patches of thin compacted snow and ice and that the runway had been sanded. NOTAM 47 was in effect at the time JAL flight JL006 landed on Runway 31R.

## DISCUSSION

On appeal, the Port Authority raises several challenges to the district court's rulings and claims that it was entitled to judgment as a matter of law or a new trial. On cross-appeal, JAL seeks review of the district court's denial of its motion for judgment as a matter of law and the district court's denial of costs to JAL as the prevailing party.

2. An 18 foot wide broom is attached to the front of a truck to sweep the runway clear of snow and ice that is too thin for a snowplow to reach.

*I. Port Authority's Motion for Judgment as a Matter of Law*

■ The Port Authority contends that there was no evidence that it had been negligent in clearing the runways, and that the district court had thus erred in denying its motion for judgment as a matter of law. Judgment as a matter of law may only be granted if there exists " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,' or the evidence in favor of the movant is so overwhelming 'that reasonable and fair minded [persons] could not arrive at a verdict against [it].' " *Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir.1997) (quoting *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154 (2d Cir.1994)). In reviewing the denial of judgment as a matter of law on appeal, we must view the evidence in the light most favorable to the nonmoving party and may reverse the denial of judgment as a matter of law only if the evidence is such that, with credibility assessments made against the moving party and all inferences drawn against the moving party, there can be but one conclusion as to the verdict that reasonable jurors could have reached. *See Equal Employment Opportunity Comm'n v. Ethan Allen, Inc.*, 44 F.3d 116, 119 (2d Cir.1994).

■ In order to prevail in a negligence action under New York law, the plaintiff must prove (1) that there was a duty owed to the plaintiff, (2) lack of due care by the defendant, (3) injury, and (4) the injury was proximately caused by the defendant's breach of duty. *Nieves v. Manhattan & Bronx Surface Transit Operating Auth.*, 31 A.D.2d 359, 360, 297 N.Y.S.2d 743, 744 (1st Dep't 1969), *appeal dismissed*, 24 N.Y.2d 1030, 302 N.Y.S.2d 852, 250 N.E.2d 253 (1969).

Upon review of the evidence that JAL presented to the jury, we are convinced that a reasonable jury viewing the evidence in the light most favorable to JAL could have found the Port Authority negligent in failing to clear the edges of the runway of loose ice and snow. JAL presented evidence of the Port Authority's alleged failure to commence snow and ice removal operations in a timely fashion, its failure to clear the areas immediately adjacent to the runway despite its awareness of the dangers involved, and its failure to notify JAL of a dangerous condition on or near the runway.

JAL also presented evidence at trial that the Port Authority failed to follow that portion of its Plan which called for it to:

> collect and provide information to air carriers on any conditions which may affect the safe operation of aircraft, including (1) snow and ice on the movement areas (e.g. runways and taxiways), and (2) snow piled or drifted on or near movement areas (14 C.F.R. § 139.339).

Additionally, the evidence presented at trial included FAA Advisory Circular 150/5200–30A, entitled "Airport Winter Safety and Operations," which reads in relevant part: "The height of a snowbank on an area adjacent to a runway, taxiway, or apron should be reduced to provide wing overhang clearance and *preclude operational problems caused by ingestion of ice into turbine engines . . . prior to the area being reopened to aircraft operations.*" Ch. 3 § 21(b)(6) (emphasis added).

■ The Port Authority's main argument is that a finding of negligence cannot be predicated upon its failure to clear beyond the edges of the runway because it had no duty to do so. We disagree. The Port Authority's status as an airport operator requires it to maintain JFK in a reasonably safe manner for the benefit of passengers and carriers using the airport. It is obligated to ensure that the airport conditions are safe for landing and departing aircraft, and to give proper warning of any condition that would affect the safe operation of an aircraft. 14 C.F.R. §§ 139.313, 139.339 (1998).

The Port Authority claims that it has in fact conformed with this standard and that it is not required to clear the sides of the runways beyond the edge lights. Due to the hazards created by loose chunks of snow and ice, it is universally recognized that such debris on or near the runways constitutes a dangerous condition. Because the Port Authority was aware of the relative narrowness of its runways in relation to the size of the aircraft landing at JFK, we think it appropriate that the Port Authority assume some responsibility for the areas beyond the edge of the runways. Its failure to do so in such cases is a violation of their duty to provide carriers and their passengers with safe operating conditions. We acknowledge and understand the difficulties imposed upon airports operating in winter conditions. Requiring them to clear beyond the edge lights may prove to be costly, yet as the district court recognized, not requiring them to do so may one day prove costlier still.

The Port Authority also claims that it cannot be held liable because it had insufficient notice that Runway 31R was dangerous. It is well settled that a defendant cannot be held liable for a defect on its property unless it had notice of the defect or, in the exercise of reasonable care, should have had such notice. *Caligurie v. Schreck's Iron & Metal Corp.*, 8 A.D.2d 991, 991, 188 N.Y.S.2d 697, 698 (4th Dep't 1959) (per curiam). We find the Port Authority's position to be unsupported by the record. The jury heard evidence that, at the time of the accident, the snow and ice had been causing problems at JFK for at least two days. The Port Authority's own logs indicated that it had experienced difficulties in controlling the snow and ice on Runway 31R since Saturday afternoon. In fact, in addition to the numerous NOTAMs and entries in the Port Authority's operations logs, there is an entry in the Snow Captain's log made at 6:00 a.m. on Saturday, December 11, indicating that the condition of Runway

31R was still unsatisfactory after brooming due to the presence of "to [sic] many chunks of ice." This directly contradicts the Port Authority's claim that it was unaware of the existence of a dangerous condition.

The evidence produced at trial by JAL clearly and reasonably supports a jury conclusion that the Port Authority had breached its duty to JAL and that such breach was a proximate cause of the damages. Therefore, the district court did not err in refusing to grant the Port Authority's motion for judgment as a matter of law.

## II. *Jury Instructions*

The district court instructed the jury that it was to treat the Port Authority as it would treat any other corporation. The Port Authority contends that this instruction was in error because it was entitled to governmental immunity. We review a claim of error in the district court's jury instructions de novo and will reverse only if the appellant shows that the error was prejudicial in light of the charge as a whole. *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 153 (2d Cir.1997); *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir.1994); *United States v. Pujana–Mena*, 949 F.2d 24, 27 (2d Cir.1991). A jury instruction is erroneous if it misleads the jury or does not adequately inform the jury on the law. *Anderson*, 17 F.3d at 556.

The States of New York and New Jersey have waived the Port Authority's sovereign immunity from suit. NY Unconsol. Laws § 7101 (McKinney 1979). The Port Authority maintains, however, that as a governmental agency of New York and New Jersey, it is entitled to assert the defense of governmental immunity. In support of this conclusion, the Port Authority points to a long line of New York cases which limits a government agency's liability for discretionary acts. *Weiss v. Fote*, 7 N.Y.2d 579, 588–89, 200 N.Y.S.2d 409, 415–16, 167 N.E.2d 63, 67–68 (1960); *see also Rampart Tennis Corp. v. City of*

*New York,* 212 A.D.2d 481, 623 N.Y.S.2d 209 (1st Dep't 1995) (memorandum decision) (determination by the City of the best way to remove remainder of partially collapsed building was at least partially discretionary and the City was thus immune from tort liability); *Litchhult v. Reiss,* 183 A.D.2d 1067, 1068–69, 583 N.Y.S.2d 671, 672–73 (3d Dep't 1992) (County's emergency preparedness plan found to constitute a discretionary act because it required an analysis of a situation and a decision about whether notification of surrounding schools, hospitals, and business was warranted), *appeal dismissed,* 81 N.Y.2d 737, 594 N.Y.S.2d 708, 610 N.E.2d 381 (1992). In *Weiss,* the New York Court of Appeals found that the City of Buffalo's Board of Safety, having made a reasonable decision with respect to the timing of traffic lights, was not subject to review. The Port Authority contends that the instant case, like *Weiss,* involves discretionary acts and urges this Court to apply the principle set forth therein to the case before us. We decline to do so for several reasons.

 First, unlike *Weiss* and its progeny, the case at bar involves a proprietary function. To the extent New York case law immunizes governmental bodies from tort liability for acts of executive discretion, that same case law does not extend such immunity to proprietary functions such as the maintenance of highways and other public facilities. *Weiss,* 7 N.Y.2d at 585, 200 N.Y.S.2d 409, 167 N.E.2d 63. New York law clearly indicates that a municipal agent engaged in a proprietary function is subject to ordinary tort liability. *See Miller v. State,* 62 N.Y.2d 506, 511–12, 478 N.Y.S.2d 829, 832, 467 N.E.2d 493, 496 (1984); *Balsam v. Delma Eng'g Corp.,* 90 N.Y.2d 966, 967, 665 N.Y.S.2d 613, 614, 688 N.E.2d 487 (1997); *see also* N.Y. Unconsol. Laws § 7106 (McKinney 1979) (consenting to liability for tortious acts). In determining whether the activity in question was a governmental responsibility deserving of immunity or a proprietary act subjecting the government entity to ordinary tort liability, we examine, "the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred." *Miller,* 62 N.Y.2d at 513, 478 N.Y.S.2d 829, 467 N.E.2d 493 (quoting *Weiner v. Metro. Transp. Auth.,* 55 N.Y.2d 175, 182, 448 N.Y.S.2d 141, 144, 433 N.E.2d 124, 127 (1982)). This dispute centers around the Port Authority's alleged failure to properly maintain the runways and taxiways of JFK and its alleged failure to notify JAL of an unsafe condition at the airport. It is undisputed that, as the operator of JFK, the Port Authority is solely responsible for the maintenance of the airport facilities and the implementation of the JFK Snow Plan, which includes snow and ice control operations at the airport, as well as notification of the carriers as to weather and surface conditions at JFK. The maintenance of the airport's runways and taxiways is sufficiently analogous to the maintenance of a public highway or other public facility so as to destroy governmental immunity and give rise to ordinary tort liability.

 Additionally, it is well established that there is no governmental immunity where a special relationship exists between the governmental entity and the injured party. *Kircher v. City of Jamestown,* 74 N.Y.2d 251, 255–56, 544 N.Y.S.2d 995, 997–98, 543 N.E.2d 443, 445 (1989); *In re M/T Alva Cape,* 405 F.2d 962, 968 (2d Cir.1969). We find that such a special relationship does in fact exist where, as here, the government entity is solely responsible for all decisions, actions, and dissemination of information pertaining to the maintenance of the runways and taxiways with regard to snow removal. In *Cuffy v. City of New York,* 69 N.Y.2d 255, 260, 513 N.Y.S.2d 372, 375, 505 N.E.2d 937, 940 (1987), the New York Court of Appeals spelled out the elements of a special relationship between a municipality and a plaintiff which would negate a municipality's claim to immunity: "(1) an assumption by the municipality, through promises or

actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking."

In the instant case, the Port Authority, by virtue of its status as the licensed airport operator of JFK International Airport, assumed an affirmative duty to keep the airport runways and taxiways free of hazards. The Port Authority, an experienced and sophisticated airport operator, was aware of the dangers of loose ice and snow posed to aircraft operating at the airport and was aware that inaction or negligent action in inspecting and clearing the runways and taxiways could cause the exact type of harm suffered here. Moreover, JAL, as a carrier operating in and out of JFK, was entitled to rely on the Port Authority's assurances of safe operating conditions on the ground. We find that the necessary elements of a special relationship exist in this case, and the Port Authority was not prejudiced by the district court's jury instructions.

Finally, with respect to governmental immunity, the Port Authority has failed to adequately explain several recent suits against it that have gone to trial despite its present claim to immunity. In *Pan American World Airways, Inc. v. Port Auth.,* 995 F.2d 5 (2d Cir.1993), the Port Authority was sued for damages in a negligence action stemming from the ingestion of ice by a Pan Am jet engine. Similarly, in *Taylor v. Port Auth.,* 202 A.D.2d 414, 608 N.Y.S.2d 499 (2d Dep't 1994), the Port Authority was sued in a negligence action stemming from the plaintiff's slip and fall on a puddle of water in a JFK terminal. We find that the Port Authority was not entitled to governmental immunity in this case, and the district court properly instructed the jury to treat the Port Authority as it would any private corporation.

### III. JAL's Motion for Judgment as a Matter of Law

On cross appeal, JAL argues that the district court erred in refusing to grant its motion for judgment as a matter of law, claiming that there was no evidence to support the jury's findings that it had been comparatively negligent. Again, we reverse a district court's denial of judgment as a matter of law only if there exists " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture,' or the evidence in favor of the movant is so overwhelming 'that reasonable and fair-minded persons could not arrive at a verdict against [it].' " *Luciano,* 110 F.3d at 214 (quoting *Cruz,* 34 F.3d at 1154).

The Port Authority advanced the following four theories of negligence against JAL: (1) the JAL flight crew either landed the aircraft slightly left of the center line of the runway, or allowed it to drift left on rollout, causing the wing of the aircraft to overhang the unplowed edge of the runway; (2) JAL should not have used maximum reverse thrust on all four engines to stop the aircraft after landing; (3) JAL did not adequately train the flight crew; and (4) the JAL crew was negligent in landing in view of the conditions. We find that none of the above theories provides a sufficient basis for a finding of negligence against JAL and hereby reverse the district court's denial of JAL's motion for judgment as a matter of law.

 Addressing these theories in order, we first find that even if, as the Port Authority alleges, the aircraft did touch down slightly left of the center line or drift slightly to the left of the centerline on rollout, this is not a sufficient basis for a finding of negligence. Landing a 747 in winter conditions is undoubtedly a difficult task, and we are convinced that a landing within a few feet of the centerline is close enough to be considered "on the center-

line" for operational purposes. In fact, as Captain Schiff, an experienced commercial pilot testified, it is not unusual at all to land slightly to one side of the centerline. In short, there is no adequate basis for a finding of negligence by the JAL crew.

■ Second, the jury heard testimony that the flight crew could have used an alternate technique to stop the aircraft which would have been more suitable to the prevailing conditions than was the reverse maximum thrust method. At trial, the Port Authority's expert witness presented an excerpt from an El–Al Airlines training manual which set forth an alternative method for slowing a Boeing 747 after landing in winter conditions. This method ostensibly reduces the risk of ingesting loose ice and snow into the engines, and Captain Schiff suggested that this method would have been more suitable given the weather conditions at the time of the incident. This testimony is flawed in a number of respects. First, the El–Al manual referred to by Captain Schiff appears to apply generically to B747 aircraft and not to the B747–400 model in particular. More significantly, the reverse maximum thrust procedure used by the flight crew is the procedure set forth by the manufacturer of the aircraft, the Boeing Aircraft Company, to bring the B747–400 to a halt after landing. We also note that both JAL and TWA, Captain Schiff's own employer, train their flight crews to use the reverse maximum thrust method. Moreover, Captain Schiff testified that he agreed completely with the Boeing procedure of applying maximum reverse thrust on all four engines upon landing a B747–400. The flight crew's decision to use the maximum reverse thrust procedure was in complete compliance with industry standards, as well as with the instructions of both the manufacturer and JAL and, as such, is an insufficient basis for an inference of negligence.

■ The Port Authority's theory that the flight crew of JL006 had not been adequately trained to land a Boeing 747–400 on a 150 foot wide runway in snow and ice conditions is also without foundation. The JAL flight crew is an experienced one with years of experience, and Captain Idesewa testified that he had landed on JFK's 150 foot wide runways "a great many times," presumably some of these in inclement weather conditions. The Port Authority offered no evidence of industry or government standards as to training or that the crew had failed to receive any required training, nor did it identify any deficiencies in the flight crew's training. In fact, the Port Authority's own expert's testimony revealed that he believed that the JAL crew had acted in complete conformity with JAL and Boeing procedures. There is no basis for a finding that the flight crew had been inadequately trained, and a jury's conclusion to this effect would only have been based on surmise and conjecture.

■ Finally, the Port Authority contends that the flight crew was negligent in landing the aircraft in the prevailing weather conditions. The crux of the Port Authority's argument is that if Captain Idesewa was not comfortable landing at JFK because of the narrow runway and the condition of the runway, he should have diverted his aircraft to another airport. This argument presupposes that the JAL crew was on notice of the runway's unsafe condition. The record reveals that NOTAM 47, which was in effect at the time Flight JL006 landed, only indicated that the runway contained "scattered patches of compacted snow and ice." The Port Authority's expert conceded that a flight crew would not be able to discern loose chunks of ice on or near the runway on approach. The flight crew had no way of detecting the hazards on the ground and so could not have been negligent in their decision to land at JFK. There is simply no basis for a finding of negligence by JAL.

## IV. Costs

■ Finally, JAL contends that the district court erred by denying an award

of costs to JAL as the prevailing party. The district court, pursuant to Fed R. Civ. P. 54(d)(1), has discretion in awarding costs other than attorney's fees. We review the district court's award of costs for an abuse of discretion. *In re Air Crash Disaster at JFK Int'l Airport on June 24, 1975*, 687 F.2d 626, 629 (2d Cir.1982).

After the verdict was returned, the district court refused to grant costs to JAL since liability had been divided evenly between the parties. However, because we reverse the district court's denial of JAL's motion for judgment as a matter of law, finding that JAL was in no way liable, we also reverse the district court's denial of costs, as any other outcome would constitute an abuse of discretion. JAL is the prevailing party and entitled to recover costs in full.

For the foregoing reasons, the judgment of the district court is AFFIRMED in part and REVERSED in part.