SR INTERNATIONAL BUSINESS INSURANCE CO., LTD., Plaintiff–Counter–Defendant–Appellee,

Copenhagen Reinsurance Co. Ltd., Employers Insurance Company of Wausau, Federal Insurance Co., Great Lakes Reinsurance PLC, Houston Casualty Co., Lexington Insurance Company, Certain Underwriters at Lloyd's, London Insurers, QBE International Insurance Limited, and Württembergische Versicherung AG, Counter–Defendant–Appellees,

v.

WORLD TRADE CENTER PROPERTIES, LLC, Silverstein Properties, Inc., Silverstein WTC Management Co., LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, The Port Authority NY/NJ, Westfield WTC, LLC, Westfield Corporation, Inc., and Westfield America Inc., Defendants–Counter–Claimants–Appellants,

UBS Warburg Real Estate Investments, Inc., Wells Fargo Bank Minnesota, N.A., As Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage–Backed Pass–Through Certificates, Series 2001—WTC, and GMAC Commercial Mortgage Corporation, Defendants–Counter–Claimants,

Gulf Insurance Company, Hartford Fire Insurance Company, St. Paul Fire and Marine Insurance Company, Swiss Reinsurance Co. UK Ltd., Tokio Marine and Fire Insurance Co., Allianz Insurance Co., Royal Indemnity Co., TIG Insurance Co., Zurich American Insurance Co., Industrial Risk Insurers, The Travelers Indemnity Company, and Twin City Fire Insurance Co., Counter–Defendants.

SR International Business Insurance Co., Ltd., Plaintiff–Counter–Defendant,

Allianz Insurance Co., Gulf Insurance Company, Industrial Risk Insurers, Royal Indemnity Co., TIG Insurance Co., The Travelers Indemnity Company, Twin City Fire Insurance Co., and Zurich American Insurance Co., Counter–Defendants–Appellants,

v.

World Trade Center Properties, LLC, Silverstein Properties, Inc., Silverstein WTC Management Co., LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, The Port Authority NY/NJ, Westfield WTC LLC, Westfield Corporation, Inc., and Westfield America, Inc., Defendants–Counter–Claimants–Appellees,

UBS Warburg Real Estate Investments, Inc., Wells Fargo Bank Minnesota, N.A., As Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage–Backed Pass–Through Certificates, Series 2001—WTC, and GMAC Commercial Mortgage Corporation, Defendants–Counter–Claimants,

Copenhagen Reinsurance Co., Ltd., Employers Insurance Company of Wausau, Federal Insurance Co., Great Lakes Reinsurance PLC, Hartford Fire Insurance Company, Houston Casualty Co., Lexington Insurance Company, Certain Underwriters at Lloyd's, London, QBE International Insurance Limited, Swiss Reinsurance

Co. UK Ltd., Tokio Marine and Fire Insurance Co., and Württembergische Versicherung AG, Counter–Defendants.

Docket Nos. 04–4500–cv(L), 05–6343–cv(CON), 05–3167–cv(L), 05–3168–cv(CON), 05–3169–cv(CON), 05–3170–cv(CON), 05–3204–cv(CON), 05–3325–cv(CON), 05–3940–cv(CON), 05–3942–cv(CON).

United States Court of Appeals,
Second Circuit.

Argued: March 7, 2006.

Decided: Oct. 18, 2006.

Herbert M. Wachtell and Eric M. Roth, Wachtell, Lipton, Rosen & Katz (Bernard

W. Nussbaum, Marc Wolinsky, Ben M. Germana, and Gordon M. Mead, Jr., Wachtell, Lipton, Rosen & Katz; John H. Gross, Proskauer Rose LLP, on the brief), New York, NY, for World Trade Center Properties LLC, Silverstein Properties, Inc., Silverstein WTC Management Co. LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC.

Skadden, Arps, Slate, Meagher & Flom LLP (Timothy G. Reynolds, New York, NY) and The Port Authority of New York and New Jersey (Megan Lee and Timothy G. Stickelman, New York, NY), for The Port Authority of New York and New Jersey.

Latham & Watkins LLP (Blair Connelly, New York, NY; Peter K. Rosen, Los Angeles, CA; Maureen E. Mahoney, Washington, D.C.; Kristine L. Wilkes, Laura A. Godfrey, Robert S. Huie, Robert G. Knaier, and Colleen C. Smith, San Diego, CA, on the brief), for Westfield WTC LLC, Westfield Corporation, Inc., and Westfield America, Inc.

Barry R. Ostrager (Mary Kay Vyskocil, on the brief), Simpson Thacher & Bartlett LLP, New York, NY, for SR International Business Insurance Co., Ltd.

Mendes & Mount, LLP (Leo W. Fraser, III, and Christine M. McNicholas, New York, NY, on the brief), for Copenhagen Reinsurance Co. Ltd.

Christopher S. Finazzo (Robert F. Cossolini and Michael Mernin, on the brief), Budd Larner PC, Short Hills, NJ, for Employers Insurance Company of Wausau.

Thomas McKay, III (Stephen A. Cozen, Jacob C. Cohn, and Michael A. Hamilton, on the brief), Cozen O'Connor, P.C., Philadelphia, PA, for Federal Insurance Co.

Stuart Cotton, Mound, Cotton, Wollan & Greengrass, New York, NY, for Lexington Insurance Company.

David Boies, Boies, Schiller & Flexner LLP (Edward Normand, Boies, Schiller & Flexner LLP, Armonk, NY; Kenneth W. Erickson, Robert A. Skinner, and Bryan R. Diederich, Ropes & Gray LLP, Boston, MA, on the brief), Armonk, NY, for Certain Underwriters at Lloyd's, London.

Baker & McKenzie, LLP (Grant Hanessian, New York, NY, on the brief), for QBE International Insurance Ltd.

Louis R. Cohen, Wilmer Cutler Pickering Hale & Dorr LLP (Seth P. Waxman, Edward C. DuMont, and Rachel Z. Stutz, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, D.C.; Catherine M. Colinvaux, Zelle, Hofmann, Voelbel, Mason & Gette LLP, Waltham, MA; John B. Massopust, Richard L. Voelbel, Patricia St. Peter, Adam P. Gislason, and Matthew J. Gollinger, Zelle, Hofmann, Voelbel, Mason & Gette LLP, Minneapolis, MN, on the brief), Washington, D.C., for Allianz Insurance Company.

Harvey Kurzweil, Dewey Ballantine LLP (John E. Schreiber, Michael Thelen, and Kathleen M. Thompson, Dewey Ballantine LLP, New York, NY; Robert J. Morrow, Hunton & Williams LLP, New York NY, on the brief), New York, NY, for Gulf Insurance Company and Travelers Indemnity Company.

Philip A. Sechler (John G. Kester and Carolyn H. Williams, Zoe S. Poulson, Janet C. Fisher, and Christina P. Giffin, on the brief), Williams & Connolly LLP, Washington, D.C., for Industrial Risk Insurers.

Michael H. Barr (Sandra D. Hauser, Edward J. Reich, and Michael R. Galligan, on the brief), Sonnenschein Nath & Rosenthal LLP, New York, NY, for Royal Indemnity Company.

Mound Cotton Wollan & Greengrass (Costantino P. Suriano, on the brief), New York, NY, for TIG Insurance Company.

Hogan & Hartson L.L.P. (William J. Bowman and Joshua D. Weinberg, on the brief), Washington, D.C., for Twin City Fire Insurance Co.

O'Melveny & Myers LLP and Wiley Rein & Fielding LLP (Paul R. Koepff, O'Melveny & Myers LLP, New York, NY; Ira H. Raphaelson, O'Melveny & Myers LLP, Washington, D.C.; M. Evan Corcoran, Wiley Rein & Fielding LLP, Washington, D.C., on the brief), for Zurich American Insurance Co.

Before WALKER, CABRANES and POOLER, Circuit Judges.

JOHN M. WALKER, JR., Circuit Judge.

These are appeals from judgments following two separate phases of a jury trial to adjudicate whether the coordinated terrorist attacks of September 11, 2001—whereby two jetliners separately crashed into the twin towers of the World Trade Center ("WTC"), destroying both buildings—constituted one or two "occurrences" under the terms of multiple insurance contracts. The parties are entities with varying property interests in the WTC (the "Silverstein Parties")[1] and the insurance companies they retained to provide approximately $3.5 billion in multilayered insurance on a "per occurrence" basis. At issue in the overall litigation is whether the Silverstein Parties can recover in the aggregate up to $3.5 billion, for one occurrence, or up to $7 billion, for two occurrences, under the terms of more than thirty separate insurance contracts that together provide the total coverage. The parties do not dispute that the destruction of the WTC resulted in a loss that greatly exceeds $3.5 billion.

The resolution of the broad question presented in these appeals—whether the coordinated attacks constituted one or two occurrences—is complicated by the fact that, as of September 11, 2001, the Silverstein Parties were still in the midst of negotiating final property insurance coverage for the WTC. Silverstein Properties had only recently entered into a long-term lease for the WTC and, with one exception, none of the many insurers that it had retained to provide property insurance coverage had issued a final insurance policy. Instead, these insurers had issued temporary binders or slips, which provide interim insurance coverage until a final policy is either issued or refused. *Springer v. Allstate Life Ins. Co.*, 94 N.Y.2d 645, 649, 710 N.Y.S.2d 298, 731 N.E.2d 1106, 1108 (2000). These fully enforceable, interim insurance contracts or binders are a product of necessity: They serve as a "quick and informal device to record the giving of protection pending the execution and delivery of a more conventionally detailed policy of insurance." *Employers Commercial Union Ins. Co. v. Firemen's Fund Ins. Co.*, 45 N.Y.2d 608, 613, 412 N.Y.S.2d 121, 384 N.E.2d 668, 670 (1978); *see also Springer*, 94 N.Y.2d at 650, 710 N.Y.S.2d 298, 731 N.E.2d 1106 (noting that a binder and a final policy are "two distinct agreements"). Because, in this case, the binders left the term "occurrence" undefined, the resolution of the broad question

---

1. The insureds include the Port Authority of New York and New Jersey, which owns the WTC property in fee simple, and Silverstein Properties, Inc. and several related entities. In 2001, Silverstein Properties was the successful bidder on a 99–year lease for the property from the Port Authority. Because Silverstein Properties is the party that actually obtained the insurance coverage at issue in this case and was the primary insured, for ease of reference we refer to all insureds as the "Silverstein Parties."

presented in these appeals required an individualized inquiry to determine what each pair of parties—the insured Silverstein Parties and each insurer—intended for the word "occurrence" to mean in each binder.

In a previous opinion in this matter, we explained our understanding of the nature of this individualized inquiry:

> In deciding which terms are to be implied in a binder, reliance may be placed on the extrinsic evidence of the parties' pre-binder negotiations. In particular, we believe that any policy form that was exchanged in the process of negotiating the binder, together with any express modifications to that form, is likely the most reliable manifestation of the terms by which the parties intended to be bound while the binder was in effect. In the absence of such a policy form underlying the negotiations or sufficient extrinsic evidence of the negotiations to determine the parties' intentions, the terms to be implied would likely be the customary terms of the insurer's own form.

*World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 170 (2d Cir. 2003); *see also id.* at 169 ("To determine the contents of a binder, New York courts generally look to (1) the specific terms contained in the binder or incorporated by reference, and (2) to the extent necessary as gap-fillers, the terms included in the usual policy currently in use by the insurance company [or those required by statute]."); *cf. LaPenta v. Gen. Accident Fire & Life Assurance Corp.*, 62 A.D.2d 1145, 404 N.Y.S.2d 182, 184 (4th Dep't 1978); *see Sherri v. Nat'l Sur. Co.*, 243 N.Y. 266, 269, 153 N.E. 70, 71 (1926); *see also Ell Dee Clothing Co. v. Marsh*, 247 N.Y. 392, 396, 160 N.E. 651, 653 (1928).

There are two policy forms that could supply the missing definition of "occurrence" in each insurance binder and, hence, determine the amount of recovery to which the Silverstein Parties are entitled: (1) the Silverstein Parties' proposed policy form, which was prepared by the Silverstein Parties' insurance broker, Willis of New York, and used during the negotiations with many of the insurers (the "WilProp form"), or (2) the insurer's standard policy form. In our previous opinion in this case, affirming the grant of summary judgment to certain insurers, we held that the WilProp form's definition of "occurrence," which aggregated and treated as a single occurrence all loses or damages "attributable directly or indirectly to one cause or to one series of similar causes," contemplated a single-occurrence treatment of the September 11 attacks. *World Trade Ctr. Props.*, 345 F.3d at 180. As a result of our previous holding, the Silverstein Parties are only entitled to a single recovery in all instances where the WilProp form supplies the definition of "occurrence."

For a large majority of insurers in this case, summary judgment was not possible and, as a result, two principal questions were left unresolved: (1) in each case where an insurer claimed to have bound to the single-occurrence WilProp form, whether the parties actually bound to that form; and (2) in each of the remaining cases, whether the parties intended to issue coverage based on a definition of occurrence that contemplated a one- or two-occurrence treatment of the events of September 11.

To answer these questions, Chief Judge Mukasey of the United States District Court for the Southern District of New York held a two-phase jury trial: The first phase was designed to determine which insurers bound to the WilProp form, and the second was designed to determine the number of occurrences for each insurer

who did not bind to the WilProp form. A jury determined that all but three of the insurers who participated in Phase I bound to the single-occurrence WilProp form. At the conclusion of the second phase of the trial, the jury determined that each of the remaining insurers—the three insurers who were found not to have bound to the WilProp form and six other insurers who conceded that fact—bound coverage to contracts that contemplated a two-occurrence treatment of the events of September 11. The district court entered separate judgments in favor of the prevailing insurers following Phase I and the Silverstein Parties following Phase II.

We now entertain consolidated appeals filed by both the Silverstein Parties, who lost at Phase I, and the insurers, who lost at Phase II, in which they challenge the Phase I and II jury verdicts, respectively. Finding no error that warrants setting aside the judgments secured by the verdicts, we affirm.

## BACKGROUND

In the spring of 2001, Silverstein Properties, Inc. was the successful bidder on a 99–year lease for the WTC in lower Manhattan. As a condition of the lease, the owner of the property, the Port Authority of New York and New Jersey, required Silverstein Properties to obtain insurance coverage, with the Port Authority and other entities also named as insureds.

Silverstein Properties retained Willis of New York ("Willis"), an international insurance brokerage firm, to negotiate the placement of a multi-layered insurance program, which consisted of a primary layer and eleven excess insurance layers providing a total of $3.54 billion in insurance coverage on a "per occurrence" basis. Willis solicited insurers for the placement by circulating a Property Underwriting Submission (the "Underwriting Submission").

The Underwriting Submission contained information regarding the proposed placement, including descriptions of the property and the insureds, desired coverage terms and conditions, estimated property values, engineering information, and a property loss history. Also included within the Underwriting Submission provided to many of the insurers was a specimen copy of Willis's own "broker" form, the WilProp form, which was intended to serve as a starting point for the parties as they negotiated over a final policy form.

The WilProp form was designed to be pro-insured; it contained a broad definition of "occurrence," which treated all losses attributable to a "series of similar causes" as a single "occurrence." By utilizing a broad definition of the term "occurrence," the WilProp form served to limit the number of deductibles that the insureds would have to pay in the event of a loss. As the Silverstein Parties explain in their briefing to this court, because "property insurance policies are written so that both deductibles and policy limits are on a 'per occurrence' basis[,] . . . it is normally in an insured's interest to be able to lump together related events that would otherwise be deemed separate occurrences into a single occurrence in order to avoid absorbing multiple deductibles." Of course, this assumes a claimed loss less than the "per occurrence" limit. Because the terrorist attacks of September 11 resulted in a loss that greatly exceeded the total one-occurrence limit of $3.54 billion, the pro-*insured* WilProp form has the perverse effect of favoring the *insurers* in that it treats the events of September 11 as a single "occurrence" and subjects any recovery under its terms to the one-occurrence limit.

Over the summer of 2001, Willis submitted the WilProp form to many of the insurers who ultimately bound coverage to the

WTC placement. Some of the insurers expressed reservations about binding to the WilProp form. The precise nature of the insurers' reservations—including whether any such reservations applied to the binder period or whether they were limited to the parties' obligations after a final policy was in place—is the subject of a vigorous dispute between the parties. Again, assuming a claimed loss less than the single-occurrence limit, it would be in an insurer's interest to narrowly define the term "occurrence" so as to require an insured to pay multiple deductibles for any loss arising out of a series of related events. In the event that a claimed loss exceeded the one-occurrence limit, however, a narrow definition of "occurrence" would be disadvantageous to the insurer; it could enable an insured to assert multiple claims for any loss arising out of a series of related events and, as a result, recover several times the one-occurrence limit.

By the end of July 2001, some of the insurers bound coverage with the WilProp serving as the operative form during the binder period, while other insurers bound coverage with their company form serving as the governing form during the binder period.[2] Because only one of these insurers, Allianz Insurance Co. ("Allianz"), issued a final policy before the attacks of September 11, for the vast majority of the insurers, the binders serve as the operative contracts governing their obligations following the destruction of the WTC.

On the morning of September 11, 2001, terrorists flew two fuel-laden jetliners into the north and south towers of the WTC, destroying both buildings and cutting short the lives of thousands of people. A little over a month later, SR International Business Insurance Co. filed suit against the Silverstein Parties, "seek[ing] a judicial declaration of its rights and obligations to all of the insureds under [its insurance] policy" and a "declaration that the damage to the World Trade Center is one insurance loss." The Silverstein Parties subsequently filed counterclaims against the other WTC insurers, seeking a declaration "that the events of September 11 constituted more than one occurrence under the coverage that the [insurers] agreed to provide to the Silverstein Parties." After an initial assignment to another judge, the litigation was assigned to Judge John S. Martin Jr. of the United States District Court for the Southern District of New York for all purposes.

Thereafter, the parties litigated various motions for summary judgment. Over the course of adjudicating these motions, Judge Martin held that three insurers—Hartford Fire Insurance Company ("Hartford"), St. Paul Fire & Marine Insurance Company ("St. Paul"), and a division of the Royal Indemnity Company, Royal & SunAlliance's Risk Management & Global Division ("Royal Global")[3]—issued binders

2. There is no real dispute that some of the insurers bound coverage with the WilProp form serving as the governing form during the binder period. See *World Trade Ctr. Props.*, 345 F.3d at 170–80 (affirming grants of summary judgment in favor of three insurers because there was no genuine dispute that the WilProp form governed during the binder period for these insurers). Because many of the Phase II insurers conceded that they had bound coverage to their own company forms, there also is no real dispute that some of the insurers bound coverage with their own policy forms serving as the governing form during the binder period.

3. Two divisions of Royal Indemnity Company, Royal Global and Royal Specialty Underwriting, Inc., issued separate binders in the WTC insurance program—based on separate negotiations. In our prior opinion in this matter, we determined that the binder issued by Royal Global was governed by the WilProp form. *World Trade Ctr. Props.*, 345 F.3d at 174–78.

governed by the WilProp form and that, under the definition of "occurrence" in that form, the destruction of the WTC was one occurrence as a matter of law. The district court entered final and appealable judgments in favor of these insurers pursuant to Federal Rule of Civil Procedure 54(b). The district court also denied a motion for summary judgment filed by the Silverstein Parties, in which they argued that the events of September 11, 2001, constituted two occurrences as a matter of law under the undefined term "occurrence" contained in the policy of another insurer, the Travelers Indemnity Company ("Travelers"). The district court certified as an appealable interlocutory order the denial of the Silverstein Parties' motion for summary judgment. *See* 28 U.S.C. § 1292(b).

The Silverstein Parties filed appeals from the Rule 54(b) judgments and petitioned this court for leave to appeal the certified interlocutory order pursuant to 28 U.S.C. § 1292(b). We granted the Silverstein Parties' petition and their motion to have the § 1292(b) appeal heard together with their separate appeals from the Rule 54(b) judgments.

On September 26, 2003, we issued an opinion affirming the judgments and order of the district court. *World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 190 (2d Cir.2003). We agreed with the district court that, with respect to Hartford, St. Paul, and Royal Global, (1) the binders issued before September 11 served as the operative contracts for these insurers, *see id.* at 169, (2) these binders were governed by the WilProp form, *id.* at 170–80, and (3) the destruction of the WTC was one occurrence as a matter of law under the definition of "occurrence" in the

WilProp form, *id.* at 180. In reaching this determination, we noted that, because the binders did not define the term "occurrence," we would look to extrinsic evidence of the parties' pre-binder negotiations. *Id.* at 170. Our review of those negotiations supported the district court's conclusion that Hartford, St. Paul, and Royal Global each issued binders governed by the WilProp form's "single-occurrence" definition. *See id.* at 170–80.

The Silverstein Parties' certified interlocutory appeal raised separate questions. That appeal was based on a two-step argument. The Silverstein Parties first argued that, "where an insurance *policy* uses the term 'occurrence' without defining the term, then, as a matter of law, the term's meaning is not ambiguous and must be decided by reference to well established New York legal precedent"; they "further argue[d] that under the definition of 'occurrence' established by New York law, the events of September 11th constituted two occurrences as a matter of law." *Id.* at 180 (emphasis added). We rejected these arguments. Specifically, we held, among other things, that (1) the Travelers binder served as the operative contract, *id.* at 183, (2) because the Travelers binder was an incomplete and unintegrated contract, we could resort to extrinsic evidence to determine the parties' intentions with respect to the undefined term "occurrence," *see id.* at 184–85, (3) the undefined term "occurrence" did not have a uniform meaning under New York law, *id.* at 186, 188–89, and (4) "the meaning of 'occurrence' in the Travelers binder is sufficiently ambiguous under New York law to preclude summary judgment and to warrant consideration by [a] fact finder of extrinsic

The instant appeals include a challenge by Royal Specialty; the Phase II jury determined that Royal Specialty issued a binder that con-

templated a two-occurrence treatment of the events of September 11.

evidence to determine the parties' intentions," *id.* at 190.

Shortly after we issued our September 26 opinion, Judge Martin retired from the judiciary after many years of distinguished service. The WTC insurance litigation was reassigned to Chief Judge Michael B. Mukasey of the United States District Court for the Southern District of New York.

Chief Judge Mukasey structured a two-phase jury trial to adjudicate the two principal factual disputes that remained unresolved following our September 26 opinion: (1) in each case where an insurer claimed to have bound to the "single-occurrence" WilProp form, whether the parties actually bound to that form (Phase I); and (2) in each of the cases where the WilProp form was found or conceded not to govern, whether the parties intended to issue coverage based on a definition of occurrence that contemplated a one- or two-occurrence treatment of the events of September 11 (Phase II). Twelve insurers and twenty Lloyd's–of–London syndicates participated in Phase I. Six other insurers chose not to participate in Phase I, conceding that their coverage was not governed by the WilProp form.

At the end of Phase I, the jury found that nine of the twelve participating insurers and all twenty of the Lloyd's syndicates bound to the WilProp form. The remaining three insurers, who were found not to have bound to the WilProp form, had their claims adjudicated in Phase II along with the six insurers who conceded that their coverage was not governed by the WilProp form. The Phase II jury determined that all nine of these insurers issued binders or, in the case of Allianz, a final policy that contemplated a two-occurrence treatment of the events of September 11. The district court rejected various motions and entered final judgments in favor of the nine successful insurers and

the twenty Lloyd's syndicates following Phase I and the Silverstein Parties following Phase II.

These appeals followed, in which the Silverstein Parties challenge the judgments entered against them following Phase I and the Phase II insurers challenge the judgments entered against them following Phase II. We consolidated the parties' appeals and heard oral argument in tandem.

## DISCUSSION

The Silverstein Parties and the Phase II insurers present parallel arguments on appeal. Both sides claim here, as they did below, that they are entitled to judgment as a matter of law, and both sides argue that, in any event, the judgments entered against them were secured by a variety of evidentiary errors and a mistaken set of jury instructions. Not surprisingly, however, neither side admits that any errors contributed to the judgments in their favor. As a result, we are led to believe that the same types of error that would require us to set aside one set of judgments are unfounded when it comes to the other set of judgments—and vice versa.

■ We review *de novo* the denial of a motion for judgment as a matter of law. *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir.2004). "In doing so, however, [we] must draw all reasonable inferences in favor of the non-moving party, and [we] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Moreover, we "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142, 151 (2d Cir. 2002) (quotation marks omitted). "We

[will] reverse [the denial of a motion for judgment as a matter of law] only when there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,' or where there is 'such an overwhelming amount of evidence' in favor of the moving party that fair minded jurors could not reasonably arrive at a verdict against the movant." *Sanders*, 361 F.3d at 755 (quoting *Phillips v. Bowen*, 278 F.3d 103, 108 (2d Cir.2002)).

We review a district court's evidentiary rulings under a deferential abuse of discretion standard, *United States v. Fabian*, 312 F.3d 550, 557 (2d Cir.2002), and will not disturb such rulings unless they are "manifestly erroneous," *Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir.1997) (citation and quotation marks omitted). In conducting our review, we are mindful of the "wide latitude" that traditionally has been afforded to district courts both in determining whether evidence is admissible, *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 148 (2d Cir.2001) (citation and quotation marks omitted), and in controlling "the mode and order" of its presentation to promote the effective ascertainment of the truth, Fed.R.Evid. 611(a).

> No error in either the admission or the exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61. "Whether an evidentiary error implicates a substantial right depends on the likelihood that the error affected the outcome of the case." *Tesser v. Bd. of Educ. of City Sch. Dist.*, 370 F.3d 314, 319 (2d Cir.2004) (quotation marks omitted). The moving party has the burden of showing that "it is likely that in some material respect the factfinder's judgment was swayed by the error." *Id.*

■ Finally, we review *de novo* a claim of error in the district court's jury instructions and will set aside a judgment secured by an erroneous charge " 'only if the appellant shows that the error was prejudicial in light of the charge as a whole.' " *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 56 (2d Cir.2000) (quoting *Japan Airlines Co. v. Port Auth.*, 178 F.3d 103, 110 (2d Cir. 1999)). "Jury instructions are erroneous if they mislead the jury or do not adequately inform the jury of the law." *Id.* It is axiomatic, however, that "a jury charge should be examined in its entirety, not scrutinized strand-by-strand." *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 119 (2d Cir.1999) (citation and quotation marks omitted).

## I. Phase I Appeals

The issue before the Phase I jury was whether the participating insurers issued binders governed by the WilProp form, which we have already held requires a one-occurrence treatment of the events of September 11. *World Trade Ctr. Props.*, 345 F.3d at 180. The Phase I insurers are twelve insurance companies and twenty Lloyd's syndicates who claim to have bound to the single-occurrence WilProp form. They can be divided into three groups: (1) London insurers (the twenty Lloyd's syndicates and five other London-based and European insurers Copenhagen Reinsurance Co. ("Copenhagen Re"), Great Lakes Reinsurance PLC ("Great Lakes"), Houston Casualty Co. ("Houston Casualty"), QBE International Insurance Ltd. ("QBE"), and Württembergische Versicherung AG ("Württ")), (2) SR International Business Insurance Co. ("Swiss

Re"), and (3) six domestic insurers (Federal Insurance Co. ("Federal"), Lexington Insurance Co. ("Lexington"), Royal Specialty Underwriting, Inc. ("Royal Specialty"), Twin City Fire Insurance Co. ("Twin City"), Employers Insurance of Wausau ("Wausau"), and Zurich American Insurance Co. ("Zurich")). The Phase I jury found that nine of the twelve insurers and all twenty of the Lloyd's syndicates issued binders governed by the one-occurrence WilProp form. The jury found that three of the twelve insurers did not bind to the WilProp form. These insurers (Zurich, Royal Specialty, and Twin City) did not appeal the Phase I verdicts and were tried in Phase II along with six more insurers who conceded that they did not bind to the WilProp form.

On appeal, the Silverstein parties assert three principal arguments with respect to the adverse judgments secured by the Phase I verdicts; they argue that they are entitled to (1) judgment as a matter of law against the London insurers, Swiss Re, and Federal; (2) a new trial as to all of the insurers based on prejudicial evidentiary errors; and (3) a new trial as to all of the insurers based on errors in the district court's charge. The Silverstein Parties also assert a variety of subsidiary arguments, which do not warrant formal treatment in this opinion. We turn to their principal arguments.

## A. Judgment as a Matter of Law

As an initial matter, the Silverstein Parties argue that the question whether the London insurers, Swiss Re, and Federal bound to the WilProp form should have never reached a jury. They contend that there is overwhelming evidence that these insurers did not bind to the WilProp form, either because of the actions of these insurers or the language that they placed in their binders. We reject these arguments: The Silverstein Parties ignore unfavorable evidence and rely on inferences and assumptions that the jury was not required to make.

### 1. London Insurers

The Silverstein Parties contend that all but one of the London insurers issued "slips" (the European equivalent to binders), which contained language that unambiguously negates an intent on the part of those insurers to bind to the WilProp form. The language at issue provides:

> FORM: J(A) and/or Companies Insurance Policy plus Wording as per Co-insurers'. Agreement of wording waived.[4]

The Silverstein Parties argue that the wording "FORM: ... Agreement of wording waived" manifests an intent on the part of the London insurers not to issue slips governed by the WilProp form. We disagree.

There are a variety of explanations for this language, any one of which is sufficient to defeat the Silverstein Parties' claim to judgment as a matter of law. As an initial matter, the Silverstein Parties' argument relies on the assumption that

4. The quoted portion of the slip appears in a section of the document containing information about the insured's coverage. The information is presented in two columns. In the first column are various categories, or fields. The categories, in succession, are "TYPE," "FORM," "INSURED," "ADDRESS," "PERIOD," "INTEREST," "SUM INSURED," "SITUATION," "CONDITIONS," "PREMI- UM," "US CLASSIFICATION," "COMMISSION," "INFORMATION," and "PROGRAM SUBLIMITS." In the other column (to the right of each category) is relevant information corresponding to each field. The abbreviation "J(A)," which appears in the quoted portion of the slip, stands for "Jacket Agreement."

the "FORM" section applies to the binder period. It is equally plausible that this section was intended only to apply to the final policy form. Under this alternative reading, the London insurers simply expressed their intention to waive their consent to the final policy wording but were willing to bind immediately to the WilProp form. In our prior opinion in this matter, we explained that "the fact that an insurer . . . demonstrated an intention to be bound by the final policy form as ultimately negotiated by [another insurer] would be relevant only to the parties' post-binder relationship, which is of no import to this case." *World Trade Ctr. Props.*, 345 F.3d at 170.

The Silverstein Parties argue that reading the "FORM" section to apply only to the final policy period "defies common sense" because it means that the London "insurers were somehow willing to give up any say as to what policy form would ultimately govern their risk once the formal policy issued, but nonetheless were requiring that the WilProp form apply during the slip period." Again, we disagree. As the London insurers explain, it is equally plausible that "[t]hey were . . . prepared to waive their rights to agree [to the final policy] form because . . . other capable co-insurers would do that work" for them.[5] Moreover, another section of the slips, entitled "INFORMATION", deemed to have been read and incorporated into the slips: "Underwriting data on file with Willis Limited." A reasonable jury could have concluded that this section governed the binder period and incorporated Willis's Underwriting Submission, which included the WilProp form.

Even if we were to assume that the "FORM" section does apply to the interim binder period—an assumption that we are not entitled to make in reviewing the denial of a motion for judgment as a matter of law—it is also possible that the language "wording as per Co-insurers" indicates an intent on the part of the London insurers to bind to the same form to which many of their co-insurers had bound: the WilProp form. These explanations, which a reasonable jury could have accepted, are sufficient to defeat the Silverstein Parties' claim to judgment as a matter of law against the London insurers.

### 2. Swiss Re

■ With respect to Swiss Re, the Silverstein Parties argue that they are entitled to judgment as a matter of law because there is overwhelming evidence that Swiss Re rejected the WilProp form. This argument is based chiefly on three discrete facts: (1) the operative slip that governed Swiss Re's obligations was issued on July 26, 2001, (2) the July 26 slip was exchanged as an e-mail attachment along with a copy of the Travelers form, not the WilProp form, and (3) there is no evidence that Swiss Re did anything thereafter to reject the Travelers form or incorporate the WilProp form into the governing slip.

The Silverstein Parties' argument, however, ignores other evidence before the jury, including evidence that Swiss Re initially bound to a slip issued on July 9, which was governed by the WilProp form, and that Swiss Re was unaware that Willis had replaced the WilProp form with the Travelers form when Swiss Re re-executed

---

**5.** The London insurers did not participate to the same extent as other insurers (collectively, the twenty-five London-based insurers provided approximately twenty percent of the total coverage); it is perfectly reasonable that these insurers would have been willing to waive their consent to a final policy form and instead accept the wording negotiated by a more deeply involved co-insurer, such as Swiss Re, who alone provided approximately twenty-five percent of the total coverage.

the slip on July 26. Specifically, a reasonable jury could have found that (1) Willis included within its solicitation to Swiss Re a copy of the WilProp form; (2) during the period prior to binding coverage, Swiss Re and Willis actively negotiated specific provisions contained in the WilProp form; (3) on July 6, Willis forwarded to Swiss Re a slip and appended the WilProp form; (4) on July 9, Swiss Re executed the July 6 slip; (5) on July 18, Swiss Re's WTC coverage became effective with the WilProp serving as the governing form; (6) on July 23, Willis forwarded to Swiss Re an e-mail with a revised slip and included an unspecified document labeled "form," which was appended to the e-mail as an attachment; (7) during a telephone conversation on July 23, Willis did not inform Swiss Re that it had attached a new form, the Travelers form, to the e-mail instead of the WilProp form; (8) on July 26, Swiss Re executed the revised slip; and (9) even though the Travelers form was the unspecified form that was attached to the July 23 e-mail, Swiss Re was unaware of this fact and believed that the form was intended only to memorialize certain handwritten modifications that it had made to the July 9 slip, not to change the form that governed during the binder period.

Based on these facts, the Silverstein parties are not entitled to judgment as a matter of law against Swiss Re. Daniel Bollier, the Swiss Re employee who negotiated the slip, testified unequivocally that he did not assign any significance to the Travelers form, which had been appended to the same July 23 e-mail that included the revised slip. He testified that he opened and scanned through the form on his computer but did not believe that it related "to the Silverstein risk." He further testified that he believed the form to be a "resending of the WilProp coverage form." A jury was entitled to credit this testimony and conclude that Swiss Re did not assent to change the form after it already had bound to the WilProp form.

Undeterred, the Silverstein Parties argue that they are entitled to judgment as a matter of law for two principal reasons. They argue that (1) Bollier rejected the WilProp form as a matter of law during the pre-binder negotiations, and (2) in any event, the July 26 slip (with the attached Travelers form) superceded the previous slip (with the WilProp form). The Silverstein Parties' arguments are without merit. The jury was entitled to find that Bollier did not reject the WilProp form during the pre-binder negotiations, and it was likewise entitled to find that, after binding to the WilProp form, Swiss Re never gave its assent to change to the Travelers form.

## 3. Federal

■ The Silverstein Parties also argue that they are entitled to judgment as a matter of law against Federal, because the plain language of Federal's binder negates any intent to bind to the WilProp form. This argument relies on select pieces of evidence and ignores disputed issues properly committed to the jury; we reject their argument accordingly.

In soliciting Federal's participation on the WTC placement, Timothy Boyd of Willis sent Federal's underwriter, Carmela O'Neal, a proposed binder and a copy of the WilProp form. On the afternoon of July 10, 2001, O'Neal sent three e-mails to Boyd, authorizing Federal's participation in the WTC program. On July 18, after a series of negotiations as to the layer that Federal would be participating in and the amount of coverage that it would be providing, O'Neal confirmed that coverage had been bound and issued Boyd a policy number.

There was evidence before the jury that after Federal bound coverage the parties

wished to formalize their relationship. On July 20, 2001, Boyd sent O'Neal a proposed document entitled "Binder of Insurance." O'Neal responded by indicating that she had several problems with the proposed binder. In response, Boyd promised to send O'Neal a revised binder.

Roughly one week later, Boyd and O'Neal spoke. Boyd was looking for the signed formal binder, but O'Neal reminded him that he had promised to send her a revised binder. Boyd stated that he had not sent the revision because other carriers, including Travelers, were still making form changes. O'Neal testified that in order to expedite the process, she agreed to make handwritten modifications to the previous binder.

The Silverstein Parties contend that these handwritten changes establish, as a matter of law, that Federal did not intend to bind to the WilProp. O'Neal inserted at the end of the binder: "Subject to manuscript form wording to be agreed. Best terms and conditions apply." Based on this modification, the Silverstein Parties contend that "O'Neal made manifest on the face of the binder her intent *not* then and there to be agreeing to any particular form but rather to leave for future agreement the policy form that would govern Federal's coverage." In response, Federal argues that the "Silverstein [parties] cannot show that their proffered interpretation of the binder is the 'only one permitted by the evidence.'" Federal continues, "To the contrary, the evidence showed that O'Neal bound Federal's coverage to WilProp, and did so nearly two weeks before O'Neal marked-up, signed and returned the 'formal' Willis binder form."

We are persuaded by Federal's argument. Based on the evidence of the parties' negotiations, the jury was entitled "to find that O'Neal's reference to 'manuscript form wording to be agreed' concerned the negotiation of the final policy form and had no bearing upon the coverage provided temporarily by Federal's binder based upon the WilProp form." Federal Br. 18. "The jury also was entitled to find that the reference to 'best terms and conditions' likewise pertained to the final policy . . . ." *Id.* This explanation is not inconsistent with our 17 understanding of the law:

"[T]he terms of a binder are not left to future negotiation. The law of New York with respect to binders does not look to the negotiations of the parties to see what terms *might* ultimately have been incorporated into a formal policy." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC ("Hartford Decision")*, 222 F.Supp.2d 385, 388–89 (S.D.N.Y. 2002). Rather, the negotiations are examined to determine what terms the parties intended to incorporate into the binder.

*World Trade Ctr. Props.*, 345 F.3d at 169 (emphasis added) (alteration and ellipsis omitted) (citation altered); *see also id.* at 170 ("[T]he fact that an insurer . . . demonstrated an intention to be bound by the final policy form as ultimately negotiated by [another insurer] would be relevant only to the parties' post-binder relationship, which is of no import to this case.").

Because the Silverstein parties' interpretation of the parties' negotiations is not the "only one permitted by the evidence," *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 145 (2d Cir.1998), it cannot support their argument for judgment as a matter of law. A reasonable jury could find that (1) Federal bound to the WilProp and (2) it never agreed to change the form that governed during the binder period.

## B. Evidentiary Challenges

The Silverstein Parties argue that numerous evidentiary errors, in both the admission and exclusion of evidence, contrib-

uted to the jury's adverse verdicts and entitle them to a new trial as to each of the Phase I appellee-insurers. Only two of these alleged errors warrant formal treatment in this opinion: (1) whether the district court abused its discretion in excluding London-based custom and usage evidence, and if so, whether that error was prejudicial; and (2) whether the district court abused its discretion in admitting evidence of the London insurers' uncommunicated subjective intent, and if so, whether that error was prejudicial.

### 1. Exclusion of London Custom and Usage Evidence

██ At trial, the Silverstein Parties "sought to introduce a wealth of custom and usage evidence showing that in the London insurance market brokers and underwriters who intend to incorporate a particular policy form into a slip do so by specifying that form on the slip by name or other 'unique reference' ... and that this failure of designation [in the London insurers' slips] coupled with the slips' language of waiver signified that the London insurers had *not* bound to WilProp." Silverstein Parties' Br. 71. The district court excluded this evidence, based chiefly upon a concern that it might conflict with our prior decision in this matter. The district court appears to have reasoned that, because, under New York law, a party need not specifically reference a form on a binder in order to bind to that form, *see World Trade Ctr. Props.*, 345 F.3d at 169–70, evidence that the London insurers must— as a matter of custom—specifically refer to a form by name on the slip in order to bind to that form would contradict New York law. *Cf. Uribe v. Merchants Bank of N.Y.*, 91 N.Y.2d 336, 342, 670 N.Y.S.2d 393, 693 N.E.2d 740, 744 (1998) (holding that the specific customs and practices of a particular industry "should not be imputed to the average merchant and should not supersede the more generally applicable rules" that governed the interpretation of the contract at issue).

As we understand their argument, the Silverstein Parties sought to establish that, because the London insurers did not follow their ordinary practice, which was to specifically refer to a form by name on the slip, that evidence suggests that the London insurers did not intend to bind to the WilProp form. We agree that evidence that the London insurers did not follow a market custom and practice is relevant to determining the parties' intent. *Cf. World Trade Ctr. Props.*, 345 F.3d at 186 ("[W]e have specifically instructed courts to consider the 'customs, practices, usages and terminology as generally understood in the particular trade or business' in identifying ambiguity within a contract ... [a]nd New York courts have long held that such evidence is admissible for purposes of construing an insurance binder." (citations omitted)). The district court, however, showed sensitivity to this portion of the Silverstein Parties' argument. Chief Judge Mukasey asked the London insurers' counsel, "If your clients testify to what they expected or believed [their actions to mean], why can't they be cross-examined on what in fact goes on in the market in which they function?" In the end, Judge Mukasey appears to have balanced these competing interests—the need to permit extrinsic evidence of the parties' intent with the desire to exclude evidence that might be viewed as superceding New York law—by precluding the Silverstein Parties from submitting direct evidence of London-based custom and practice but permitting the Silverstein Parties to cross-examine the London insurers' witnesses on this point. In our opinion, the district court did not abuse it discretion in structuring the admission of the evidence in this way.

Moreover, even if it was error to exclude the Silverstein Parties' direct evidence of London-based custom-and-practice, the error did not "affect [their] substantial rights." Fed.R.Civ.P. 61. The Silverstein Parties cross-examined a London insurers' witness on the customs and practices of the London-based insurers, during which they asked specific questions based on a document that purportedly memorialized the London-based insurers' practice of referring to a form by name on the slip. The Silverstein Parties also argued in summation that the failure to follow the alleged practice of specifically referring to a form by name on the slip tended to negate the London insurers' intent to bind to WilProp: "Blackmore, Lawrence have told you that ... if the underwriter or broker has an intent to bind to a particular policy form, what you do is you say it right in the form section of the slip itself." We believe that any error in excluding the Silverstein Parties' direct evidence of custom and practice was harmless.

## 2. Admission of Subjective Intent Evidence

The Silverstein parties argue that the district court abused its discretion when it permitted several of the insurers' witnesses to testify as to which form they thought they had bound to during the course of the parties' negotiations. They contend that this testimony should have been excluded as impermissible evidence of the insurers' uncommunicated subjective intent. They further contend that the admission of "such self-serving testimony constituted prejudicial error and requires a new trial."

 "The cardinal principle for the construction and interpretation of insurance contracts—as with all contracts—is that the intentions of the parties should control." *Newmont Mines Ltd. v. Hano-*

*ver Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986). Under New York law, this is accomplished by looking to "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 361 N.E.2d 999, 1001 (1977). The parties' communicated expressions are interpreted objectively to give effect to the " 'reasonable expectations' " of the parties, not necessarily their actual expectations. *Id.* at 400, 393 N.Y.S.2d 350, 361 N.E.2d 999; *see also Mencher v. Weiss*, 306 N.Y. 1, 7, 114 N.E.2d 177 (1953) ("[T]he manifestation of a party's intention rather than the actual or real intention is ordinarily controlling."). Thus, it has been said that "the existence of a binding contract is not dependent on the subjective intent of either [party]." *Brown Bros. Elec.*, 41 N.Y.2d at 399, 393 N.Y.S.2d 350, 361 N.E.2d 999.

 Although a party's uncommunicated subjective intent cannot supply the ultimate meaning of an ambiguous contract, it is quite another thing to hold that such evidence is wholly irrelevant and inadmissible for other purposes. *Cf.* Fed.R.Evid. 401 (stating that evidence is relevant if it has "*any* tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" (emphasis added)); *Kabil Devs. Corp. v. Mignot*, 279 Or. 151, 157, 566 P.2d 505, 508 (1977). Under the objective theory of contract, the parties' " 'reasonable expectations' " are determined based on an objective understanding of the "attendant circumstances [in which the agreement was made], the situation of the parties, and the objectives they were striving to attain." *Brown Bros. Elec.*, 41 N.Y.2d at 400, 393 N.Y.S.2d 350, 361 N.E.2d 999 (citations omitted); *see also*

*Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 11, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972) (stating that, when a contract is ambiguous, "the court may and should look to the prior negotiations [of the parties] to determine what was intended"); *Kitching v. Brown*, 180 N.Y. 414, 420, 73 N.E. 241 (1905) ("One of the familiar rules applicable to the interpretation of ambiguous covenants and agreements is to ascertain, as nearly as may be, the situation of the parties, their surroundings and circumstances, the occasion and apparent object of their stipulations, and from all these sources to gather the meaning and intent of their language."). At least with respect to a negotiated agreement, a party's subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions. *See Kabil*, 279 Or. at 158, 566 P.2d 505 (stating that "a factfinder might well believe that what a party thought he was doing would show in what he did").

▆▆▆▆ In this case, the jury was asked to determine whether the parties intended for the WilProp form to govern during the binder period. *Cf. Underwood v. Greenwich Ins. Co.*, 161 N.Y. 413, 423, 55 N.E. 936 (1900) (stating that parol proof of the parties' intentions was permissible in order to supply the terms of an unintegrated and incomplete insurance binder). We think that the insurers' subjective understandings were relevant insofar as they provided the jury with an understanding of the state of the parties' negotiations and helped to explain the parties' overt actions. *See, e.g., World Trade Ctr. Props.*, 345 F.3d at 171 (relying on the testimony of one of the insurer's witnesses, who stated

that he "understood the WilProp form was only a draft and would ultimately require amendment"). For example, the fact that an insurer thought that it had bound to the WilProp form might help to explain the changes that it made to the interim binder. As a result, we conclude that the district court did not abuse its discretion when it permitted some of the insurers' witnesses to testify as to which form they thought that they had bound, "as long as the jury was not misled into treating this testimony, in its context, as something more than evidence bearing on the behavior and the perceptions of the parties to the negotiation." *Kabil*, 279 Or. at 158, 566 P.2d 505.

We do not believe that the jury was so misled in this case. The district court gave an appropriate limiting instruction:

> A party's intent that is not communicated to the other party has no bearing; only the intent indicated by words and acts that are made known to the other party may be considered. You may recall that I permitted some witnesses to testify about their own understanding and assumptions about certain events even though they did not communicate those understandings and assumptions to another party. That testimony was received only to help explain the witness's own actions and statements. However, a witness's own understandings that are not communicated to another party cannot change the meaning of statements and acts that are communicated to that other party.

Accordingly, we reject the Silverstein parties' claims of error regarding subjective intent evidence.[6]

---

**6.** The Silverstein Parties cite to only one case where a New York state court, faced with interpreting an ambiguous term, deemed inadmissible evidence of a party's subjective intent. *See Rickerson v. Hartford Fire Ins. Co.*,

149 N.Y. 307, 314–15, 43 N.E. 856 (1896). The *Rickerson* court, however, did not address whether such evidence was inadmissible for all purposes. *See id.* It simply held, consistent with the district court's instruction in this

## C. Jury Instruction Claims

The Silverstein Parties also argue that the district court's jury instructions were legally deficient and contributed to the verdicts secured by the insurers. These arguments are without merit.

### 1. Claimed Instructional Errors as to the London Insurers

■ At trial, the Silverstein parties argued to the jury that none of the London insurers bound to the WilProp form. They asserted that, if the jury found that no form governed, then it was likely that the insurers' customary form would serve as a gap filler. *Cf. World Trade Ctr. Props.*, 345 F.3d at 170 ("In the absence of [an exchanged] policy form underlying the [parties'] negotiations or sufficient extrinsic evidence of the negotiations to determine the parties' intentions, the terms to be implied would likely be the customary terms of the insurer's own form."). The Silverstein Parties argue on appeal that the district court's charge effectively precluded the jury from reaching this result. "[N]ot only did the district court refuse to charge the jury that the parties need *not* agree upon a particular form at the time of binding," the Silverstein Parties contend, "it then compounded the error by instead charging the jury that '[a] binder's coverage terms are *typically* governed by a particular policy form.'" The Silverstein Parties argue that by instructing the jury that binders are "typically governed by a particular policy form," the district court in effect instructed the jury that it would be "atypical" for an insurer not to bind coverage on any particular form.

When read in full, however, the district court's charge did not negate the Silver-

stein Parties' "no form" argument or contradict New York law. The district court's charge was consistent with the standard we announced in our prior opinion. *Compare* Appx. 6848 ("A binder's coverage terms are typically governed by a particular policy form."), *with World Trade Ctr. Props.*, 345 F.3d at 170 ("[W]e believe that any policy form that was exchanged in the process of negotiating the binder, together with any express modifications to that form, is likely the most reliable manifestation of the terms by which the parties intended to be bound while the binder was in effect."). Contrary to the Silverstein Parties' argument, the district court did not preclude their "no form" or "gap filler" argument; it specifically charged the jury: "In the absence of such a policy form underlying the negotiations or enough other evidence of the negotiations to determine the parties' intentions, the terms to be implied would likely be the customary terms of the insurance company's own form, unless there is evidence indicating that an understanding existed between the parties that a different policy form would apply to the binder and that the insurance company was aware of its terms." *Cf. World Trade Ctr. Props.*, 345 F.3d at 170 ("In the absence of such a policy form underlying the negotiations or sufficient extrinsic evidence of the negotiations to determine the parties' intentions, the terms to be implied would likely be the customary terms of the insurer's own form, unless there is evidence indicating that an understanding existed between the parties that a different policy form would apply to the binder and that the insurer was aware of its terms."). We reject the Silverstein Parties' argument that the dis-

case, that it was error to interpret the ultimate meaning of an ambiguous term based on a party's uncommunicated subjective intent. *Id.* at 313–14, 315, 43 N.E. 856. We do

not read *Rickerson* as precluding evidence that would tend to aid a factfinder in understanding the parties' negotiations.

trict court's charge precluded their "no form" or "gap filler" theory. In particular, Judge Mukasey's statements to the jury that a "binder's terms are *typically* governed by a particular form," and that "the terms to be implied would *likely* be the customary terms of the insurance company's own form," indicate that the district court's instruction merely limited—pursuant to our previous case law—the circumstances under which a "no form" or "gap filler" theory would plausibly apply. As suggested by the judge's use of the words "typically" and "likely," the charge did not categorically preclude the applicability of such theories to the case.

## 2. Claimed Instructional Errors as to Swiss Re

The Silverstein Parties next argue that the district court's charge as to Swiss Re was deficient in two respects. First, the Silverstein parties assert—as they do against all the insurers—that the district court's charge as to a "no form" or "gap filler" possibility was legally deficient and prejudicial. For the reasons stated above, we reject this argument.

■ Second, the Silverstein Parties argue that the district court's charge did not account for the possibility that Willis withdrew the WilProp form prior to Swiss Re's acceptance of that form. The district court, however, instructed the jury:

The parties agreed to a particular form if they both intended at the moment their agreement as to form was incorporated into the binder, that that form would govern. A party may offer certain terms and then withdraw these terms. If they are withdrawn before the other party accepts them, then they are of no effect. However, if terms are accepted before they are withdrawn, they cannot be changed or withdrawn

unless the party that accepted them agrees to the change or withdrawal.

The Silverstein parties fault this instruction as legally deficient because it was not in the section entitled "Changing from the Original Form." But as the district court recognized, in order to be in the "Changing from the Original Form" section, the jury had to first find that there was an initial agreement as to form. By its terms, the "Changing from the Original Form" section only applies where the parties have already agreed to a particular form.

In full, the "Changing from the Original Form" section of the charge provided:

*Where the parties have agreed to a binder that includes an agreement that a particular policy form will govern the terms of coverage,* the party may later decide to change the binder by agreeing to use a different form. *In order to change to a different policy form,* both parties must agree to the change. The standard for determining whether the parties agreed to change to a different policy form is the same as the standard for determining whether the parties agreed to use a particular policy form in the first place.

If one party suggests changing to a different form, the binder does not change unless the other party agrees to use the different form. If the other party remains silent, then that party has not agreed to change unless its silence would have a tendency to mislead the party that suggested the change. On the other hand, the other party may agree, by words or actions, to switch to the new form even if that party has received but not read the form, but only if that party has also been given fair notice of the existence and availability of the form for review.

Similarly, you may find, if you believe that the evidence justifies it, that the

parties simply agreed that the initial form would no longer govern without necessarily agreeing on which form would govern in its place. In that event, the parties' agreement would be governed by the same rule that applies when there is not enough evidence to determine the parties' intention, as described on page 15 of these instructions.

Although the jury expressed some confusion as to one aspect of the "Changing from the Original Form" section, it did not relate to the possibility that Willis withdrew the WilProp form prior to acceptance by Swiss Re. Instead, the jury focused on the second paragraph of the "Changing from the Original Form" section. Specifically, the jury asked:

Request for clarification of Jury Charge, p. 18, paragraph starting "If one party suggests . . ." ending "availability of the form for review."

The jury is in disagreement as to what this paragraph means. What is the implication of a party remaining silent? What does "unless its silence would have a tendency to mislead the party" mean? And does just getting the form, and remaining silent, constitute agreement to the form? We're hung up on Exh. A 1 and whether or not that is an indication of an intent to switch form. Can you be deemed to agree to a change in form while remaining silent?

Exhibit A 1 was a copy of the July 23 e-mail from Willis to Swiss Re, which included two attachments: a copy of the revised slip and an unspecified "form." As we have already explained, the unspecified form turned out to be the Travelers form.

The district court responded as follows: If the parties have agreed to a form, and one of them asks to switch to a different form, there are three possibilities. The first occurs if the other party responds by saying it agrees. Obviously, in that instance the parties have agreed to a new form and that form governs, even if the party receiving the new form did not bother to read it, so long as that party received fair notice that it was getting a new form. The second occurs if the other party disagrees. In that instance, since there was an earlier agreement to a form, that earlier agreement continues to govern because it cannot be changed without the agreement of both parties. However, if the other party expresses neither agreement nor disagreement, but simply remains silent, what happens? The answer is that the earlier agreement continues to govern, unless silence would mislead the party that asked to switch forms by making that party believe that there had been an agreement.

On the seventh day of the deliberations, the jury indicated that it had reached unanimous verdicts as to all the insurance companies except for one: Swiss Re. The jury then stated, "We have focused our efforts on this one insurer for the majority of the last five days, with great diligence, and in spite of our best efforts have not been able to reach a unanimous decision." After taking the verdicts for all the insurance companies except Swiss Re, the district court issued an Allen charge and dismissed the jury for the weekend.

On the following Monday, the jury resumed its deliberations. During the afternoon, the jury sought further clarification of the district court's instructions regarding the ramifications of Swiss Re's silence after receiving the Travelers form:

What if a party's silence to a proposed change in form makes the other party believe that there was no agreement to change the form at that time, but leaves the decision as to a change in form open to be agreed or disagreed up to the time of final policy being issued? During the

period between the binder being signed and the loss, can the decision as to whether or not to change form (effective during the binder period) be left outstanding?

Counsel for Silverstein argued that the district court should instruct the jury on the possibility that Swiss Re never accepted the WilProp form. The district court refused: "Mr. Wachtell, if they are on page 18, that is headed Change in Form, and I am not about to tell them ... they shouldn't be on page 18." Instead, the district court sent a follow-up question: "Are you asking about what happens if one party proposes some change in the status of a form previously agreed to but the parties do not mutually agree that a change will take place?"

Shortly thereafter, the jury returned a final note in response: "We are asking about what happens if one party proposes a change to another policy form but the parties do not mutually agree that a change will take place." The district court responded to the note by stating, "Jurors, if there was an initial agreement, that agreement continues to control unless and until the parties agree that it does not control." Moments later, the jury returned a verdict for Swiss Re.

As the preceding recitation makes plain, the district court provided fair and balanced instructions that contemplated the many possible outcomes, including the Silverstein Parties' "withdrawal of form" theory. The charge also made plain that before the jury could arrive at the "Changing from the Original Form" section, it had to first find that the parties agreed to an initial form. The Silverstein Parties' arguments to the contrary are without merit.

### 3. Claimed Charging Errors as to the Domestic Insurers

The Silverstein Parties also contend that instructional error contributed to the ver-

dicts in favor of all three of the domestic insurers: Federal, Lexington, and Wausau. The record, however, does not suggest error, let alone prejudicial error.

As an initial matter, the Silverstein Parties return to a familiar refrain: They argue that the "Changing from the Original Form" instruction was prejudicial because it prevented the jury from finding that there was no agreement as to a particular form, and from this the jury might have concluded that the insurers' customary form governed. For the reasons stated above, we reject this argument.

█ The Silverstein Parties also argue that the district court's instructions were erroneous as to a particular provision in the binder drafted by Willis, which provided "manuscript form ... as ultimately agreed." The Silverstein Parties argue that the evolution of this provision supports a conclusion that the domestic insurers did not intend to bind to the WilProp form.

When Willis initially sent a proposed binder to the domestic insurers, it included a section entitled "Property and Time Element Covered." That section provided the following statement:

And as incorporated into the manuscript form, in conjunction with the contract between the Port Authority of New York and New Jersey *as attached.*

When Willis sent out a new copy of the binder, however, it changed this language slightly:

And as incorporated into the manuscript form, in conjunction with the contract between the Port Authority of New York and New Jersey *as ultimately agreed.*

At trial and in their briefs before this court, the Silverstein Parties argue that

the language "as ultimately agreed" referred to the "manuscript form." From this they argue that the domestic insurers did not intend to bind to a form during the binder period. Instead, they intended to use their customary forms until the final policy form was in place.

The district court issued an instruction foreclosing this argument as a matter of law:

> Various witnesses have testified that the words "as attached" and "as ultimately agreed" refer to a policy form or forms. Regardless of what those witnesses may believe or not, it has been determined that they do not relate to a policy form or forms, they relate to the lease agreement between the Port Authority and Silverstein that was under negotiation; and that has nothing to do with the issues before you. That has been determined and you must accept that as true.

In giving this instruction, the district court relied upon a portion of this court's prior decision, which the district court interpreted to mean that no reasonable jury could find that the words "as attached" and "as ultimately agreed" referred to "manuscript form."

The district court's instruction and understanding were consistent with our prior decision, in which we rejected as unreasonable any claim that the language "as ultimately agreed" could lend support to the proposition that the parties intended to bind, sight-unseen, to the yet-to-be-issued Travelers form. *World Trade Ctr. Props.*, 345 F.3d at 173. We explained that the language "as ultimately agreed," which was included in the section labeled "Property and Time Element Covered," referred to the Port Authority's contract with the Silverstein Parties regarding the leased property, not the exchanged "manuscript form." *Id.* ("From all these references to the ultimate agreement between the Port Authority and Silverstein Properties, the most that can be gleaned is that the precise parameters of the property covered by the insurance would have to await the finalization of that contract. *No factfinder could reasonably find that these references related to following the form of Travelers as the lead insurer.*" (emphasis added)). Accordingly, the district court's instruction was not erroneous.

### D. Remaining Arguments

We have considered the Silverstein Parties' remaining arguments relating to the Phase I appeals—including other evidentiary arguments not addressed above—and find them all to be without merit.

### II. Phase II Appeals

The issue before the Phase II jury was whether each of the remaining insurers issued binders or, in the case of Allianz, a final policy that contemplated a one- or two-occurrence treatment of the terrorist attacks of September 11. The Phase II insurers are the three insurers who were found not to have bound to the WilProp form (Zurich, Royal Specialty, and Twin City) and six other insurers who conceded that they did not issue a binder or final policy governed by the WilProp form (Allianz, Gulf Insurance Co. ("Gulf"), Industry Risk Insurers ("IRI"), TIG Insurance Co. ("TIG"), Travelers Indemnity Co. ("Travelers"), and Tokio Marine and Fire Insurance Co. ("Tokio Marine")). The Phase II jury found that all nine of these insurers issued binders or, in the case of Allianz, a final policy form that contemplated a two-occurrence treatment of the events of September 11. Eight of these insurers appeal; Tokio Marine reached a settlement with the Silverstein Parties after the jury rendered its verdicts.

The appellant-insurers assert four principal arguments on appeal. They argue

that they are entitled to (1) a new trial based on the admission of expert testimony provided by a Silverstein Parties' witness, (2) judgment as a matter of law because the Silverstein Parties failed to provide sufficient evidence of the parties' intent, (3) judgment as a matter of law based on the language in each insurers' policy form, and (4) a new trial based on the admission of purportedly irrelevant and highly prejudicial evidence during the examination of a Travelers claims executive. The Phase II insurers also assert various subsidiary arguments, which do not warrant formal treatment in this opinion. We address their principal arguments in turn.

### A. Expert Testimony

### 1. Admission of Expert Testimony

As an initial matter, the insurers argue that the district court should not have permitted a Silverstein Parties witness to testify as to custom and usage in the insurance industry. Specifically, they contend that Jeffrey McKinley was not qualified to testify as an expert witness on customs and practices regarding "per occurrence property insurance" coverage. We disagree.

The Silverstein Parties proffered McKinley as an expert witness on property insurance coverage and sought to qualify him based on his experience in the industry. McKinley had 31 years of experience in the insurance industry, including 23 years as a broker specializing in property insurance and 4 years as an underwriter for a property insurance company. McKinley also has reviewed hundreds of per occurrence property insurance forms during the course of his career.

The insurers offer three main criticisms: (1) McKinley lacked practical experience on which to ground his opinion, (2) McKinley employed no genuine methodology and drew upon no external reference points in reaching his opinion, and (3) McKinley could not offer a consistent, reliable methodology by which he applied his opinions to the facts of this case. All of these arguments fail.

The insurers recognize that an expert may be qualified based on his experience. *See* Fed.R.Evid. 702 (stating that an expert may be qualified based on "knowledge, skill, experience, training, or education"). They contend, however, that such an expert "must show how his or her experience (here, experience in the property insurance industry) led to his conclusion or provided a basis for his opinion." And we agree. McKinley, however, was able to satisfy these criteria. He testified that he had over 30 years of experience in the insurance industry (as both an underwriter and a broker) and he was familiar with practices in the industry, including the practices that related to "per occurrence" property provisions. He explained that through these experiences, he was able to identify a practice whereby insurers tie the definition of occurrence to a physical cause of loss in order to maximize the number of deductibles that an insured would be required to pay. And he testified that insurers used "hours" clauses when they wished to aggregate the losses associated with specific perils—e.g., hurricanes and earthquakes.[7] The fact that McKinley was not aware of any instance where his understanding of custom and practice had been applied to a terrorism case is hardly sur-

---

**7.** An hours clause treats all losses associated with a specific peril as one event or occurrence, provided that the losses took place within a specified time-period. Thus, an hours clause might read: "All losses arising from a hurricane, flood, or earthquake shall be considered one occurrence if they were sustained within a seventy-two hour period."

prising given the unprecedented nature of the September 11 attacks; fortunately, insurers have not had to adjust many terrorism losses.

The insurers make much of the fact that McKinley's testimony differed from that of Douglass, a Willis employee who testified during a deposition that when Willis defined the term "occurrence" in the 2000 WilProp, it did not intend to change the meaning of that term as it existed in previous forms designed by Willis. McKinley's testimony, however, was not inconsistent with this testimony. On direct, McKinley testified that *insurers* used a narrow definition of "occurrence" to maximize the number of deductibles. The fact that *insureds*, through brokers like Willis, understood their own forms to incorporate a broad definition of "occurrence" in no way detracts from McKinley's testimony that *insurers* used a narrow definition of "occurrence." During the second phase of the trial, it was the *insurers'* forms that governed. A reasonable factfinder could conclude that when the Silverstein Parties acquiesced to an insurer's customary form, they were accepting that insurer's narrow conception of occurrence.

In arguing that McKinley's testimony was inadmissible, the insurers also ignore the fact that his testimony did not depend on engineering or scientific expertise; it concerned the customs and practices of the insurance industry. In *Iacobelli Construction, Inc. v. County of Monroe*, involving a dispute over the meaning of a public construction contract, this court distinguished between expert testimony concerning "scientific knowledge" and testimony regarding "trade usage." 32 F.3d 19, 25 (2d Cir.1994). Iacobelli Construction sued the County of Monroe after the county denied its request for additional compensation under the contract's "differing site conditions" clause. *Id.* at 21. According to

Iacobelli Construction, "it encountered more subsurface water inflows during construction of [a] tunnel than it had anticipated." *Id.*

The minutia of public construction contracts aside, the case involved a battle of experts over the proper interpretation of the construction contract and the pre-bid conditions at the contracting site. *See id.* at 24–25. Both sides submitted expert affidavits, which "purported to summarize and analyze the site conditions, the contract documents, and the project's results." *Id.* at 24. The district court, however, excluded Iacobelli Construction's submissions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and granted summary judgment in favor of the defendants. *Iacobelli*, 32 F.3d at 24–25. The district court held that Iacobelli Construction's "affidavits were conclusory and failed to articulate how they arrived at their conclusions" and viewed them as "an attempt to 'supplant [the] court's interpretation of the documents with [the expert's] own conclusions, based upon his interpretation of trade usage.'" *Id.* at 24. This court reversed on appeal:

> We believe the district court erred in its rejection of the affidavits of [plaintiff's experts]. Its reliance on *Daubert* was misplaced. *Daubert* sought to clarify the standard for evaluating "scientific knowledge" for purposes of admission under Federal Rule of Evidence 702.... The affidavits of [plaintiff's experts] do not present the kind of "junk science" problem that *Daubert* meant to address. Rather, they rely upon the type of methodology and data typically used and accepted in construction-litigation cases.

*Id.* at 25 (citations omitted).

We conclude that the district court acted within its discretion when it permitted McKinley to testify as an expert on custom

and practice in the property insurance industry. *See Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 185 (2d Cir. 2001) (reviewing the admission of expert testimony "under a deferential abuse-of-discretion standard"); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). To the extent that there are gaps or inconsistencies in McKinley's testimony, those issues "go to the weight of the evidence, not to its admissibility." *Campbell*, 239 F.3d at 186; *cf. Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 ("The focus [of the admissibility inquiry], of course, must be solely on principles and methodology, not on the conclusions that they generate."). "[T]he weight of the evidence is a matter to be argued to the trier of fact, not a basis for reversal on appeal." *Campbell*, 239 F.3d at 186.

## 2. Sufficiency of Custom and Usage Evidence

Even if McKinley is qualified to testify as an expert, the insurers argue that his testimony was legally insufficient to establish that there was a "fixed and well-established" industry custom that the *undefined* term "occurrence" referred to a physical-cause-of-loss. They also argue that McKinley's testimony was inadmissible because it failed to establish an industry custom regarding the undefined term "event," as that term was used by some of the insurers when they *defined* the term "occurrence." We conclude that McKinley's testimony presented evidence sufficient to raise an issue of fact as to whether the terms "occurrence" and "event" held a uniform meaning among the insurers.

▄▄ Under New York law, evidence of custom and usage must establish that (1) the term in question has a " 'fixed and invariable' " usage and (2) that the "party sought to be bound was aware of the custom, or that the custom's existence was 'so notorious' that it should have been aware of it." *British Int'l Insur. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir.2003) (citations omitted). "The trade usage must be 'so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto.' " *Id.* at 84 (citation omitted). "The burden of proving a trade usage has generally been placed on the party benefitting from its existence." *Id.* at 83 (citation, quotation marks, and alteration omitted).

▄▄ "Whether a usage exists is a question of fact, to be determined by the trier of fact." 12 Richard A. Lord, *Williston on Contracts* § 34:19 (4th ed. & Supp.2005) (footnotes omitted); *accord Walls v. Bailey*, 49 N.Y. 464, 476 (1872) ("Not only the existence of such a usage, but whether knowledge of it exists in any particular case, is a question of fact for the jury."). As is the case with all factual questions, however, "the evidence of the existence of a custom and usage can be insufficient to warrant submission of the question to the jury." Lord, *supra*, § 34:19 (citing *McClellan v. Pa. R.R. Co.*, 62 F.2d 61, 63 (2d Cir.1932)).[8]

---

**8.** Although *Williston on Contracts* relies on *McClellan* for the unexceptional proposition that "evidence of the existence and usage can be insufficient to warrant submission of the question to the jury," Lord, *supra*, § 34:19, *McClellan* involved the question whether there was evidence of a custom-to-warn-employees sufficient to establish liability in negligence under the Federal Employers' Liability Act, *see McClellan*, 62 F.2d at 62. *McClellan* did not involve contract interpretation. *See id.* In reciting the standard for custom and usage in the context of federal tort liability, the *McClellan* court stated: "Proof of a custom cannot be said to be enough to submit that issue to the jury unless there is substantial evidence to show that what is called custom amounts to a definite, uniform, and

■ The precise standard for determining whether a party has met its burden of production with respect to custom-and-usage evidence has not been clearly articulated under New York law. We conclude that to raise a genuine issue of fact as to the existence of a particular custom and usage, the party seeking to establish that custom and usage must establish, by competent evidence, that the practice is fixed and invariable. *See Lawrence v. Cohn*, 325 F.3d 141, 150–51 (2d Cir.2003) (holding that an "affidavit constituted credible evidence of the invariable meaning of the terms" in a partnership agreement, but also noting that the affidavit "was not contradicted by any evidence proffered by the plaintiffs"). Where one party submits evidence that a particular custom or usage exists, and where the other party—the party to be charged with actual or constructive knowledge of that custom—puts forth evidence to the contrary, the question should be submitted to a jury unless no reasonable factfinder could find that such a custom existed. *See Dickinson v. City of Poughkeepsie*, 75 N.Y. 65, 77 (1878) (stating that if witnesses from both parties "differ as to [the] existence [of a particular custom] in the same place or in all places, . . . this would raise a question for the jury"); *accord Scott v. Brown*, 29 Misc. 320, 60 N.Y.S. 511, 512

(App.Term.1899); *see also Walls*, 49 N.Y. at 476–77.

■ Informed by these standards, we conclude that the Silverstein Parties brought forth evidence sufficient to establish an industry custom that *insurers* utilize a narrow definition of "occurrence" in their industry forms. McKinley testified that, absent a total loss, it is in an insurer's best interest to define "occurrence" in terms of a physical-cause-of-loss in order to maximize the number of deductibles that an insured is required to pay. McKinley also testified that, in his experience, this definition "does not vary" and is "well known within the industry."

> It is for the jury . . ., under proper instructions from the court, to take all the evidence in the case; that as to the existence, duration and other characteristics of the custom or usage, and that as to the knowledge thereof of the parties; and therefrom to determine whether there is shown a custom of such age and character, as that the presumption of law will arise, that the parties knew of, and contracted in reference to it . . . .

*Walls*, 49 N.Y. at 477. Not one of the insurers has raised a serious challenge to the district court's instructions on the standard that the jury should apply or the weight that should be given to custom and usage evidence.[9] We hold that the district

---

known practice under certain, definite, and uniform circumstances." *Id.* at 63. We intimate no view on whether this is the appropriate standard governing the meaning of a contract under New York law.

9. The district court's jury instruction with respect to custom and usage evidence provided:

> To help you decide what the parties intended by the term occurrence, you may also consider evidence of the custom and usage in the insurance industry as to the accepted meaning of that term. However, I want to caution you that the issue you must resolve is what the parties intended, not

simply what was customary or common usage in the insurance industry.

> The Silverstein parties have presented evidence as to the custom and usage in the insurance industry with respect to the meaning of the term occurrence when that term is either not defined, or is defined as it is in the forms that govern here. The insurance companies have presented contrary evidence on that subject.

> In order for any party to prevail on its view of custom and usage, that party must prove two things by a preponderance of the evidence: (i) that the meaning of the term occurrence was fixed and well-established

court did not err in permitting the jury to consider evidence of an industry custom regarding the undefined term "occurrence" in the insurers' customary forms.

 In order to establish a custom adverse to all of the Phase II insurers, however, the Silverstein Parties were required to elicit testimony regarding the meaning of "occurrence" as that term was defined by at least five of the eight Phase II appellee-insurers (Allianz, IRI, TIG, Zurich, and Twin City).[10] These insurers' forms defined the term "occurrence" to mean a loss, disaster or casualty, or a series of losses, disasters or casualties arising out of one "event" (or a single event). Their forms, however, did not define the term "event."

As the insurers point out, McKinley testified neither that the term "event" is invariable nor that it has a well-known meaning within the industry. Instead, he stated his agreement to the posed question: "Is there a *general understanding* in the insurance industry as to the meaning of the term event in a property insurance policy that leaves that term undefined?" His agreement—that there is a "general understanding" in the insurance industry—would appear insufficient, on its own, to establish a fixed and invariable custom

regarding the term "event." *See Hutner v. Greene*, 734 F.2d 896, 900 (2d Cir.1984) (holding that, under New York law, an affidavit stating that a practice is "often used" is insufficient to establish a triable issue that a "fixed and invariable" custom exists).

The Silverstein Parties argue that even though McKinley did not use the words "well known" or "does not vary" to describe the meaning of the phrase "one event," he "unequivocally testified that the undefined term occurrence has the *same meaning* in the industry as the 'arising out of one event' formulation, including the 'arising out of one event formulation used in IRI's form and the Allianz policies.'" Stated differently, the one-event formulation and the undefined term "occurrence" are each tied to a physical cause of loss. Although we regard this as a close question, we conclude that the Silverstein Parties have met their burden of production with regard to establishing the existence of a custom associated with the one-event formulation of the term "occurrence," as that term is defined in the insurers' customary policy forms. Our conclusion is supported by the fact that the *insurers* likewise stated and argued to the jury, during both their opening and closing statements, that their policy forms, despite

in the insurance industry, and (ii) either that the parties you are considering knew of that fixed and well-established meaning, or that the meaning was so universally accepted that the parties should have been aware of it. If you find that the evidence of custom and usage does meet this test, you should apply it where you find it relevant, unless you find that there is more convincing evidence showing a different intent by the parties. If you do find that there is evidence of the parties' actual intent that is more convincing than the evidence of insurance industry custom and usage, even after you weigh the effect of custom and usage on the parties' intent, then that more convincing evidence should prevail.

10. Royal Specialty issued separate binders for each of the three layers of coverage that it provided for the WTC placement. Royal Specialty acknowledges that a standard industry form (ISO form) governed all layers of its coverage and did not include a definition of "occurrence." Royal Specialty, however, issued a separate form governing its participation in the excess layers. The excess-layer form defined "occurrence" based on the one-event formulation utilized by many of the other phase II insurers. Thus, to the extent that the excess-layer form governed Royal Specialty's participation, its obligations are determined based on the one-event formulation of "occurrence."

any differences, each treated the number of occurrences the same way—albeit as a single occurrence. *Cf. Dickinson,* 75 N.Y. at 77 (stating that if witnesses from both parties "differ as to [the] existence [of a particular custom] in the same place or in all places, this would raise a question for the jury"). A reasonable jury could conclude that where the term "occurrence" appears in an insurer's customary form, it is intended to mean the same thing regardless of whether that term is defined based on a one-event formulation.

### B. Sufficient Evidence of Intent

■■■ Various insurers also contend that the Silverstein Parties failed to produce evidence of intent sufficient to permit a jury to find that the terrorist attacks of September 11 constituted two occurrences under the insurers' policy forms. Their arguments pursue a common theme: At trial, the Silverstein Parties failed to adduce *any* evidence of the parties' intent to accept a definition of occurrence that contemplated a two-occurrence treatment of the events of September 11. We disagree.

In addition to McKinley's custom and usage testimony, the jury had before it evidence that (1) none of the Phase II insurers bound to the WilProp form; (2) the WilProp form treated the term "occurrence" differently than the insurers' forms treated that term; (3) the Silverstein Parties did not obtain congruent coverage during the binder period but instead bound to the Phase II insurers' company forms and, on other instances, bound to the WilProp form; (4) there is language contained in each of the Phase II insurers' forms that provides that coverage is triggered by a direct physical loss or damage to the insured property; (5) most of the Phase II insurers' forms included "hours" clauses, which aggregated the losses associated with certain causes of loss but did not

specifically refer to losses caused by fire, aircraft, or acts of terrorism; and (6) the destruction of the WTC was caused by separate fires, resulting from separate collisions by separate aircraft into separate buildings. We conclude that this evidence was sufficient to support the jury verdicts. *See World Trade Ctr. Props.,* 345 F.3d at 190 ("To be sure, a jury could find two occurrences in this case ... or it could find that the terrorist attack, although manifested in two separate airplane crashes, was a single, continuous, planned event causing a continuum of damage that resulted in the total destruction of the WTC, and, thus, was a single occurrence."); *cf. Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 135, 137 (2d Cir.1986) (holding that "the evidence developed at trial[, which consisted mostly of evidence that excess snow accumulated on two separate sections of a roof, each capable of supporting a weight of ice and snow independent of the other,] fully supported a finding that the collapse on two different days of two separate sections of the ... roof constituted two occurrences").

### C. Judgment as a Matter of Law

Those insurers whose forms defined the term "occurrence" argue that they are entitled to judgment as a matter of law, because the defined term "occurrence" unambiguously contemplated a one-occurrence treatment of the attacks of September 11. In addition, Allianz argues that it is entitled to judgment as a matter of law because its "hours" clause—a clause designed to aggregate specific perils and treat them as a single occurrence if any one of those perils occurs within a specified time period—applies to "vandalism and malicious mischief"; it argues that terrorist acts come within the ambit of "vandalism and malicious mischief" and, as a result, the attacks of September 11 should be treated as a single occurrence as

a matter of law. We address these arguments seriatim.

### 1. The Defined Term "Occurrence"

■ Those insurers whose forms defined the term "occurrence" to mean any loss or a series of losses arising out of one event (or a single event) argue that this definition is sufficiently unambiguous to justify judgment in their favor as a matter of law. They argue that the district court construed the term "event" to mean "occurrence," and that this reading robbed the definition of "occurrence" of any meaning because it was designed to aggregate a "series of losses" arising out of any "event" and treat those losses as a single occurrence. In the words of one of these insurers, "[T]he fact that the attack was an 'event' and the fact that the destruction of the World Trade Center arose out of it are dispositive."

Obviously, the meaning of the term "event" is of critical importance. If "event" is interpreted to mean "all related phenomena," then the insurers' definition of "occurrence" would aggregate all losses associated with all related phenomena, such as the coordinated terrorist attacks of September 11, and treat them as one "occurrence." If, on the other hand, "event" is defined to mean "a physical phenomenon," then the insurers' definition of "occurrence" would treat all losses associated with a single physical phenomenon, such as a single aircraft collision, as one "occurrence." In either case—whether "event" is defined broadly (all related phenomena) or narrowly (a physical phenomenon)—the provision would continue to perform its aggregating function; it would continue to treat all losses associated with a given "event" as a single "occurrence." Thus, if "event" is defined to mean "a physical phenomenon," and if a single airplane crash caused damage to both towers of the WTC, then the Silverstein Parties would be entitled to recover for only one "occurrence," even though the plane caused losses to both buildings. Unfortunately for the insurers, on the facts of this case, a narrow reading of "event"—defined as "a physical phenomenon"—would entitle the Silverstein Parties to two separate recoveries: One recovery for each airplane crash, limited to all losses associated with each crash.

We conclude that the defined term "occurrence" is not sufficiently unambiguous, because the word "event" is susceptible to more than one reasonable interpretation. As a result, the insurers are not entitled to judgment as a matter of law.

### 2. "Vandalism and Malicious Mischief"

■ Allianz argues that it is entitled to judgment as a matter of law based on its "hours" clause, which aggregates all losses associated with certain specified perils. Its hours clause provides:

> When the word ["occurrence"] applies to loss or losses from the perils of tornado, cyclone, hurricane, windstorm, hail, flood, earthquake, volcanic eruption, riot, riot attending a strike, civil commotion and vandalism and malicious mischief one event shall be construed to be all losses arising during a continuous period of seventy-two (72) hours.

Allianz contends that the terrorist attacks of September 11 are a form of "vandalism and malicious mischief" and, as a result, these attacks should be treated as a single occurrence as a matter of law.

In our prior opinion in this matter, we explained that "[w]hether a contract is ambiguous is a question of law for a court to determine as a threshold matter." *World Trade Ctr. Props.*, 345 F.3d at 184. We also explained that "an ambiguity exists where a contract term could suggest more

than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (quotation marks and citation omitted).

Following a standard similar to that employed by this court, Judge Martin found that the phrase "vandalism and malicious mischief" is sufficiently ambiguous to preclude summary judgment. *SR Int'l Bus. Insur. Co. v. World Trade Ctr. Props. LLC*, No. 01 Civ. 9291, 2003 WL 554768, at *6 (S.D.N.Y. Feb. 26, 2003). Judge Martin explained:

Applying the test of "common speech," it cannot be said that the ordinary businessman would consider an act of wanton terrorism such as the attack on the World Trade Center to be an act of malicious mischief or vandalism. One could argue that the Japanese attack on Pearl Harbor fits within the dictionary definition of "malicious mischief" or "vandalism." But, if one searched all of the contemporaneous or historical accounts of that attack, it is doubtful that even one account would be found which described it as an act of malicious mischief or vandalism. Since the attack on the World Trade Center resulted in an even greater loss of life and property damage than the raid on Pearl Harbor, it is equally inappropriate to describe that attack as an act of malicious mischief or vandalism. Although the full text of the "occurrence" definition in the Allianz policies supports the argument that the attack on the World Trade Center should be considered one occurrence, that is not the only reasonable construction of the definition. Therefore, the issue must be decided by a jury and the motion for summary judgment is denied.

*Id.* We agree with Judge Martin's conclusion. Allianz has not pointed to a general practice within the insurance industry of treating terrorism as a form of vandalism, and if it wished to specifically incorporate acts of terrorism within its hours clause, it certainly could have done so. The phrase "vandalism and malicious mischief" is sufficiently ambiguous to preclude judgment as a matter of law in Allianz's favor.

## D. Admission of Purportedly Irrelevant and Prejudicial Evidence During the Examination of a Travelers Claims Executive

Travelers makes an argument (adopted by several of the other insurers) that the district court abused its discretion by permitting the Silverstein Parties to cross-examine William Guernsey, a Travelers claims executive, about a comparison he and other Travelers executives drew between the events of September 11 and Travelers' treatment of claims associated with four fires that were set to four separate courthouses in California by a single arsonist (the "Contra–Costa claims"); Travelers treated these claims as four separate occurrences, which required four separate deductibles. Travelers argues that this evidence was irrelevant, and even if it was relevant, it was highly prejudicial and should have been excluded by the district court.

Guernsey was responsible for adjusting both the WTC and the Contra–Costa claims. On September 11, 2001, he learned that Travelers had provided coverage to the WTC, that the Travelers form governed its coverage, and that the Travelers form did not define the term "occurrence." Guernsey was already well-aware that Travelers had decided to treat the Contra–Costa claims as separate occurrences under a similar policy form, even though two of the four fires that were set to the courthouses occurred at closely situ-

ated buildings only minutes apart. On the very same day, September 11, the Ninth Circuit issued an opinion adopting the position that Travelers had pressed in litigation associated with the Contra–Costa claims. *Lexington Ins. Co. v. Travelers Indem. Co. of Ill.*, 21 Fed.Appx. 585, 590 (9th Cir.2001) ("We agree with the district court that four separate fires in four separate buildings at four separate locations constitute four separate occurrences for purposes of the [the primary insurers'] liability and the policy deductible." (citation omitted)). Shortly thereafter, Guernsey and other Travelers executives recognized the relevance of that litigation, as it related to their World Trade Center placement; they also recognized the irony that Travelers had pressed its position for a narrow definition of "occurrence" in the Contra–Costa case.

Although the district court prevented the Silverstein Parties from providing to the jury statements that Travelers had made in its briefs in the Contra–Costa litigation, it permitted the Silverstein parties to cross-examine Guernsey on the comparison he drew between the two claims. Apparently, the district court found this information relevant to the Travelers executives' pre–9/11 intent. The insurers never moved for a limiting instruction, and both sides were permitted to make arguments on the significance of this evidence. We find no abuse of discretion in allowing this cross-examination of Guernsey.

### E. Remaining Arguments

The Phase II appellant-insurers press several other arguments—among them, additional claims of error in the admission and exclusion of evidence, a purported jury-charge error, even a claim that Silverstein Parties were not entitled to factfinding by a jury. We have considered all of these arguments and find them to be without merit.

* * * * *

Both the Silverstein Parties and the Phase II appellant-insurers suggest that the divergent judgments entered in these cases must be the product of manifest error. Implicit in their arguments is an all-or-nothing supposition: Because it was in both sides' interest to develop congruent coverage that would govern during the final policy period, and given that half the insurers bound to forms that contemplated one type of coverage, all the insurers must have bound to forms that contemplated the same coverage during the binder period. We disagree. This all-or-nothing supposition is mistaken because it assumes that congruent coverage was achieved during the binder period and ignores overwhelming evidence that different insurers issued interim binders governed by different forms. These forms were designed with different interests in mind and, not surprisingly, yielded different results. In our opinion, the jury's determination that the insurers provided different coverage is not a manifestation of judicial error—indeed, Chief Judge Mukasey did a masterful job shepherding this complex, hotly contested case through both phases of a lengthy jury trial—but rather, a reflection of the fact that the parties were at various stages of negotiating coverage when the two hijacked airplanes destroyed the WTC.

### CONCLUSION

The judgments of the district court are AFFIRMED. The appellants from the Phase I and II appeals shall bear a proportional share of the appellees' costs associated with defending each appeal.